WIERMAN *v.* BAY CITY-MICHIGAN SUGAR CO.

1. CONTRACTS—CROPS—SUGAR BEETS—TITLE TO CROP.
   A contract between a beet sugar company and an individual, by the terms of which the latter agreed to grow, on rented land, a crop of beets from seed furnished by the company, examined, and *held*, that by its terms the title to the crop vested in the company as soon as it began to grow.

2. PRINCIPAL AND AGENT—AUTHORITY OF AGENT—EVIDENCE—AGENT'S DECLARATIONS.
   Circumstances attending the harvesting and shipment of a crop of beets by the agent of a sugar company examined, and *held*, that there was no evidence to go to the jury as to the agent's authority to bind the company to pay debts contracted by the grower of the beets, the agent's declarations not being admissible.

3. SAME—ADMISSIBILITY.
   The declarations of an alleged agent respecting his authority are admissible only after his authority has been shown.

4. SAME—APPARENT POWER.
   The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent.

5. NOVATION—ELEMENTS—RELEASE OF ORIGINAL DEBTOR.
   Novation exists only where there is an extinguishment of the original debt, the creation of another, and the assent of the three parties to the new contract.

6. SAME—EVIDENCE.
   What was said and done at the time a novation is claimed to have been effected governs the rights of the parties, and subsequent statements of the creditor that he looked to the new debtor and not to the original are incompetent.

7. CONTRACTS—CONSIDERATION—FORBEARANCE.
   Forbearance to bring attachment by one having no grounds therefor is no consideration for a promise by the owner of the property threatened to pay the debt of a third person.

8. PRINCIPAL AND AGENT—AUTHORITY OF AGENT—EVIDENCE.
   Evidence that defendant, through its agent, paid other claims similar to that of plaintiff, is not admissible either to show

the agent's authority or to raise an inference that an agreement was made by defendant's agent to pay plaintiff's claim.

Moore, C. J., and Blair, J., dissenting.

Error to Bay; Shepard, J. Submitted January 6, 1905. (Docket No. 35.) Decided December 30, 1905.

Assumpsit by Frank Wierman against the Bay City-Michigan Sugar Company for work and labor done and for rent. There was judgment for plaintiff, and defendant brings error. Reversed.

*Simonson, Gillett & Clark*, for appellant.

*D. L. Johnson*, for appellee.

MOORE, C. J. The claims on which plaintiff sues grow out of the raising of a crop of beets by one James Wierman, plaintiff's brother. There are three claims—one for labor of plaintiff, and two for rent of land owned, respectively, by David Gary and George Hinbaugh, both assigned to plaintiff for purpose of suit. In February, 1902, James Wierman entered into an arrangement with the defendant company for the raising of 51 acres of beets, executing a contract in two parts, which read, so far as is material to this issue:

"1. Said first party agrees to plant the seed furnished by said second party; that he will sow 15 pounds to the acre; that he will plant, cultivate, and harvest the beets raised by him under this contract, as he shall be from time to time directed by said second party, during the month of December or later. Beets to be delivered after the 1st of November must be pitted by first party. In harvesting said beets said first party will cut off the tops clean and square at the base thereof, so that no part of the stem, where leaves have grown, shall be left thereon. All seed furnished for planting beets under this contract shall be paid for at the rate of 15 cents per pound at Bay City, and the amount for the same and any advances made by said second party to said first party shall be deducted from the first payment due for beets. In delivering beets, said first party will exercise due care to prevent stones, dirt,

or other refuse to become mixed with the beets delivered either in wagons or cars.

"2. It is mutually agreed that the title to said crop of beets to be grown from seed furnished by said second party, and on the lands above described, shall vest in second party as soon as the crop begins to grow; but the amount to be paid to said first party shall be based solely upon the quantity of beets actually delivered in accordance with the terms of this contract. This provision is inserted in this contract for the express purpose of preventing any other person, persons, or companies from acquiring any interest in the title or right to the possession of said beets.

"3. It is further agreed that beets purchased under this contract shall be delivered to said second party's beet sheds in Essexville, and shall be paid for as follows: Beets testing 12 %, October delivery, $4 per ton; November delivery, $4.50 per ton; December or later delivery, $5 per ton—and 33⅓ cents per ton for each 1 % more or less, for beets containing a greater or less amount of sugar. Payable on the 15th day of the month for beets delivered the previous month.     *     *     *

"6. In case second party's factory shall be destroyed by fire, or otherwise injured to prevent receiving beets, in such an event all beets not delivered shall be properly cared for by first party and delivered as ordered by second party; such extra necessary expense of pitting and delivery to be borne by second party.

"7. No additions or alterations made by agents will be binding upon the second party.

"J. P. WIERMAN, Farmer.
"Bay City Sugar Company,
"W. L. CHURCHILL, Agent.
"P."

"February 26, 1902.
"BAY CITY SUGAR COMPANY.

"*Gentlemen:* I this day enter into a contract with your company to raise forty-six (46) acres of sugar beets, as per the terms of your blue contract. In entering into this contract I represent to you that I have sufficient means to prepare the land and plant same; also that the land that I have rented to be planted to beets that the rent will be paid by me after the crop is taken off, and the owners of the land will look to me and not to the crop for the rent. In consideration of the above, the Bay City Sugar Com-

pany agrees to advance me sufficient money to thin, culti-
vate, and harvest the crop, and all moneys received from
the Bay City Sugar Company I agree shall be used for the
above purpose.

"J. P. WIERMAN.
"Accepted:    BAY CITY SUGAR COMPANY."

It does not appear from the record that either of these
papers was ever recorded.    In April following Mr. Wier-
man made a verbal lease with Gary for some land upon
which to grow beets he had contracted to grow, and also
a verbal lease from Hinbaugh of land to be used for the
same purpose, and agreed with them the rent should be
paid out of the first beets shipped, and upon the trial testi-
fied he so informed the company.    He also testified that
when the contracts were drawn the company knew he
had no money with which to pay rent.    The record does
not show Gary and Hinbaugh knew the details of the
contract between the company and Wierman.    Wierman
planted the land and hired his brother — plaintiff in this
case — to work in the fields with his team.    The sugar
company made considerable advances to Wierman.
Some time late in October or early in November the de-
fendant company sent Mr. Penny to Breckenridge to look
after its interests.    The claims of the parties as to what
then occurred appear in part in a portion of the charge of
the court to the jury, and, as this charge is also the sub-
ject of criticism, we quote from it:

"It is claimed that, after the defendant company took
possession of the beets and went on to harvest them, they
sent a man up there to attend to that work for them, and
the plaintiff in this case claims that he himself, and the
man Hinbaugh and the man Gary, went to this man, who
was harvesting the beets for the company, and told him
that they must have their pay for getting out these beets,
and if they did not they were going to stop the delivery of
the beets, and this agent told them to let the beets go on
down to the factory and they should be paid.    He would
see that they had their pay, and the company would pay
them.    Now, if this man Penny had authority and was
the agent of the company, had the authority to go up there

and bind the company for past indebtedness, such as is claimed in this case, for existing indebtedness to the extent of a trifle over $400, if in the management of the business he was authorized by the company to incur that indebtedness and to bind them to pay the same to clear up any claim that might exist against these beets after they had obtained possession of them as stated, if he had authority so to do, and if it was agreed between James Wierman and these men and this company through a lawfully authorized agent, the three of them all agreeing that they should pay that amount of indebtedness, it might be a valid agreement between the parties.

" *First.* There must be an agreement on the part of the defendant, the sugar company, through an authorized agent, an agent having authority to undertake to pay the bill or the account of these parties.

" *Second.* There must be an agreement or understanding between those parties, having these claims against James Wierman, that the sugar company should pay, and an understanding that James Wierman should be released from, the claims, and the sugar company be solely liable to the parties; the parties looking to it solely and releasing the man James Wierman. If they did not release and intend to release Wierman from his obligation, and only accept the sugar company to pay his debts, the debt that Wierman owed them, but to become security to make payment of it, that would be void under the statute of frauds, because it is not in writing, and because any undertaking to pay the debt of another will be void unless it is in writing and signed by the party charged. In other words, if it was an agreement to pay the debt of Wierman, it would be a promise to answer and to pay them the debt of Wierman, and that would be void unless it was in writing and signed by the sugar company or their lawful agent. The claim is made on the part of the plaintiff that it was not an undertaking to pay the debt or to secure the payments to these parties who together make the plaintiff, but that it was an undertaking to pay the debt, and that they then and there according to the terms of the arrangement released James Wierman from the debt, because, if the debt was still existing and outstanding, it would not be a novation or attornment, as it is called in law. Now, did these parties make the arrangement that they claim with the agent of the company, he having authority to pay that debt, and did they release James Wierman, and was

it and is it their purpose not to look to him, whatever the result of this case may be ?    *Second.* Did this defendant, through its agent there, Mr. Penny, undertake to pay those men this bill, regardless of whether there was any funds or any surplus out of which to pay after the beets had been taken in ?    It appears that when the beets were actually taken in there was a shortage of over $400.    Such were the conditions of the year that the man James Wierman gave up the contract, gave up the beets, and let them take charge of them, and he gave his time so far as he might in getting them in, but did not take any general charge of the matter, but he left them to take care of them as best they might.    Out of it there was that loss as is claimed upon the part of the defense, and there was a loss on the other side too as is apparent there.    The agency of Mr. Penny to make any such arrangements as is claimed, if it was made, is denied by the sugar company's secretary, who had sole charge, evidently, of all the negotiations and transaction; and it is claimed that Mr. Penny, who went up there, simply had authority to go up there and harvest these beets, and not to incur any existing obligations, and that he did not incur any existing obligations whatever of any kind, that he did not intend or propose, and had no thought or idea of binding this company to the extent of those claims to the amount claimed here for anybody. The secretary of the company testified that he had no power to do any such thing as that, that he never conferred upon him or upon any of the agents any such power.    He could only submit proposed expenditures, proposed action on his part, to the company in regard to what he should do, and act under their approval or direction, and when they approved and directed they would send him the money to carry it out; that they never gave any such authority, or heard of it, or knew of any such claim as is made in this case, or authorized it.

"That is the issue, gentlemen.    You have heard the testimony as to what Mr. Penny assumed to do.    Mr. Penny testified that he had no power to do that and that he did not undertake to do it; that as far as he went was when the beets were shipped out to the factory and when the account was made up with James Wierman, why, whatever money there was surplus he would pay that upon their account with James Wierman's consent, and that is as far as he undertook to go.    You have heard the testimony and all the testimony on both sides, and it is a

question for you, gentlemen of the jury, under the testimony in the case, as to the action of Mr. Penny, as to his power or authority. Did he have authority to bind the company in the way it is claimed upon the part of the plaintiff? If he had, the company would be liable; if he had not, there would be no liability in this case.

"The burden of proof is on the plaintiff, as you have heard me say in many cases this term. When he brings this case into court, he must establish his case by a preponderance of evidence in order to entitle him to recover. If he fails to do so, he fails to recover in the case.

"If you find that, after the agreement relied on by plaintiff is claimed to have been made, the debts owing by James Wierman to plaintiff and his assignors were not canceled or extinguished, but remained in force against him, the plaintiff cannot recover.

"If you find that James Wierman still owes to plaintiff or his assignors the amounts in controversy, and will be liable for them if plaintiff fails to recover in this action, then plaintiff cannot recover.

"If you find that an agreement such as is claimed was made merely as security for the debts of James Wierman, and not as absolute payment, then plaintiff cannot recover.

"The defendant would not be liable to plaintiff on an agreement with James Wierman to pay his debts, unless the latter's creditors were parties to the same agreement.

"Defendant would not be liable on any verbal agreement with the creditors of James Wierman to pay his debts, unless the defendant Wierman and the creditors in question all joined in the agreement and also Wierman's liability was absolutely extinguished and defendant's liability substituted for it.

"If the plaintiff and his assignors had no legal lien on the crop of beets raised by James Wierman, and the defendant had a prior title, then based upon the grounds of lien there would be no consideration for the promised claim to have been made, and the plaintiff could not recover upon the ground of lien.

"The agreement relied upon, alleged to have been made by Penny as agent for the defendant, the plaintiff cannot recover unless you find that this agent was authorized to make such an agreement and that it was in the scope of his authority."

Most of the important assignments of error hinge upon

the portion of the charge quoted and the questions related thereto. It is insisted by counsel for appellant:

(1) That the written instruments gave the ownership of the crop to the defendant. Jones on Chattel Mortgages, § 140.

(2) That no alterations or additions made by an agent could bind the company.

(3) That Mr. Penny had no authority to make the arrangement referred to by the witnesses and the judge in his charge.

(4) That what Mr. Penny said as to his authority was incompetent under *Bond* v. *Railroad Co.*, 62 Mich. 643, and other cases cited.

(5) That all testimony as to any agreement between Mr. Penny and the plaintiff and his assignors was incompetent.

(6) That a verdict should have been directed for the defendant.

1. Did the written instrument give the ownership of the crop to the defendant? A question much like this was presented in *Lingle* v. *Owosso Sugar Co.*, 139 Mich. 203, which the court found it unnecessary to decide. In this case, because of the finding of the jury in relation to the contract which the company made through Mr. Penny with the plaintiff and his assignors, we deem it unnecessary to decide this question.

2, 3, 4, 5, and 6 may be discussed together. Could the company be bound by any alteration or addition made to the contract by an agent? It is clear a corporation can accomplish nothing, except by the agency of men who are authorized to act for it. The defendant company was organized to make sugar from beets, a crop not generally grown, and for which there is no general market. To make sugar the defendant must have the beets. To get them it must grow them or contract to have them grown. Mr. Penny was the agent of the company for some purposes. He has been in its employ since December, 1901. His place of operation was out of town in any section of the country where the company sent him. We quote from his testimony:

" I went down there to get out beets shipped in from the contractors. We had a great acreage in that year. It was later than the 1st of November. I was sent there to get the beets into the factory as soon as possible, because they expected to close about the 1st of January, as usual. I also looked after the beets supposed to have been grown by Mr. Thistle. I also went there to see about the beets grown by Mr. Wierman, as well as 200 or 300 others. I went there with no instructions in regard to Mr. Wierman's beets, particularly, any more than the others. I was to assist and get the beets into the factory as soon as possible. * * * I went to superintend the getting in of the beets, which I did. I also superintended the getting in of the beets of Mr. Sensabaugh. There was nothing said between me and Mr. Wierman about my taking charge of the beets for the company. It was not necessary to say anything. He was doing nothing to it. I went there to get the beets in. He did practically nothing. I had instructions from the company to get Wierman's beets in. I received, while I was there, some moneys from the company with which to get in these beets. I cannot remember how much. I cannot tell whether it was one or two checks. It was whatever was necessary to take in the beets, to pay for the labor. I paid for all the labor that was incurred after I went there. I paid for none that was incurred before that I know of. If any bill was brought in that was paid, it was smuggled in. * * * We had possibly 10 or 15 people working for us at that time on Wierman's beets. We paid them whenever they presented their bills. Some of them would quit, and when they came in would bring the bills, and if I hadn't money I couldn't pay them off two or three times until there was enough to get a check from the company, then I telephoned the company how much money was necessary to pay for those bills, and they sent the check. When the bills were receipted, we remitted them to them. I think I just sent down for checks twice. I sent down for a specific amount each time, corresponding with some bills which I had to pay. That check will tell you that. I did not say I was paying off about every night. Some of them were leaving every day, and if there was a few of them left today, and a few tomorrow, I would keep them until there was enough to make it an object. I would not send for a small check. Some of them had only a few days' pay coming to them. Mr. Sensabaugh paid part of

these bills in my presence. He was better acquainted with the people, and he could identify the parties, and I made use of him in that way. He did not have the money deposited in his name. We had one or two instances where women wanted their money right away. They came in at night, and I had no money, and Mr. Sensabaugh made a check to pay them, and I reimbursed him as soon as the check came."

It is true this witness denies he had authority to pledge the credit of the company. He denies that he had authority to make the contract testified to by the witnesses. The witnesses for the plaintiff said he assumed to have authority and made a contract. He denies he made any such contract. The secretary of the company says of Mr. Penny:

"At the time he went to Breckenridge in the fall of 1902 his instructions were to go up there and get the beets in from contractors. That was as far as his authority extended to get the beets in."

His testimony discloses that at this time the company had made large advances to Wierman. He testified Penny had no authority to pledge the credit of the company. He testified:

" In this instance and in some instances where he had taken charge of the beets he paid those labor claims himself, as he did in this case. I was aware of that. * * * We would take his word up to $100 or $150, and ask him to send in receipts for money, showing where it was paid out."

It is clear from the testimony of defendant's witnesses that Mr. Penny went to Breckenridge for the purpose, among other things, of taking possession of this crop and getting it to the factory, and that he was authorized to do so by the officers of the company. The written contract contemplated the beets should be harvested and delivered by Mr. Wierman as directed by the company. It makes no suggestion of any expectation or right on the part of the company to take possession of the crop, harvest it, and deliver it. What, then, was the situation when Mr. Penny

went to Breckenridge? Mr. James Wierman had a crop of more than 40 acres of beets, which he had put in under a written contract upon land leased after the written contract was made, with the rent to be paid out of the first shipment. Into this crop he had put all the advances made by the defendant, considerable of his own time and trouble, and $60 of his own money, and the labor of his brother and his team. He was entitled to any balance from the proceeds of the crop after defendant had been paid the price of the seed and its advances. It was then getting to be late in the fall. The company had in the crop the price of the seed and several hundred dollars in advances. It sent Mr. Penny to Breckenridge as its agent to get in the crop. He says he was instructed by the company to get the beets in. It is apparent that if he were to take charge of the crop, hire men and teams to do so, paying them therefor, and delivering the beets to the factory, that he was doing something which by the terms of the written contract he was not authorized to do. His testimony and that of the secretary of the company, as well as the testimony of plaintiff's witnesses, discloses he did these things. It is true he and the secretary say he had no authority to pledge the credit of the company, but he did this daily by hiring men and teams to harvest and draw the crop and engaging cars for the transporting of the beets. It is difficult to see how the officers of the company expected Mr. Penny to go to Breckenridge to do what he was sent to do without their also expecting he would add to and alter the terms of the written contract. It is evident some arrangement was made by Mr. Penny when he took control of the crop for the company. He and the witnesses do not agree as to what that arrangement was. Mr. James Wierman says the arrangement was that the company would pay the claims against the crop and take it.

"The conditions were that they would pay the claims that were against them. They paid some for work which had been done before; that I had incurred. Mr. Penny and Mr. Sensabaugh together paid those claims. I hand-

ed them the amount of all those claims.   They were aware of the amount of Frank Wierman's, Hinbaugh's, and Gary's claims.   I don't know of my own knowledge of the arrangement between these parties and Mr. Penny, only just as I have overheard some of it.   I heard it promised that they would get their pay if they would let the beets go to the factory.   That was done by Penny and Sensabaugh both.   They were both present.   Those parties allowed the beets to go, and they were shipped to the company.

" *Q.* Has Mr. Gary, or Hinbaugh, or Mr. Wierman, your brother, ever made claim to you for their money?

" *A.* They did not."

Mr. Sensabaugh, who was sent to Breckenridge with Mr. Penny, and who helped hire men and teams, and who paid out a good share of the money for the defendant, in the presence and under the direction of Mr. Penny, testified:

" We talked over the matter in regard to what had been done and the work that had been done on the beets.   Men had pulled beets, and topped beets, and such work as that, and they wanted their pay; and we asked Mr. Wierman to make an itemized statement of their account.   That was what had been accomplished before the company took charge.   He made those statements.   They were to Mr. Penny and me.   *   *   *   I knew of Mr. Penny pledging the credit of the company in agreeing to pay Mr. Wierman these other bills.   Outside of that I never knew of his doing so.   I never did outside of that which is involved in this case.   I raised a crop of beets that year myself.
*   *   *

" *The Court:* What arrangements, if any, did Mr. Penny make with those parties or Mr. Wierman about the payment of these claims?

" *A.* Mr. Wierman was going to attach the beets.   He came to me and Mr. Penny, and he was going to attach the beets, and Mr. Penny told Mr. Wierman to let the beets go, and when the matter was settled up after the beets were in, so that Mr. James Wierman's account could be balanced up, he would get his money.   I don't think Frank Wierman took any action.   I don't know of his attaching the beets.   All these beets were loaded on cars."

Mr. Hinbaugh, one of the men whose land had been leased, testified to having heard of the arrangement made

between Mr. Penny and Wierman, and sought an interview with the former.

"I told him the understanding Mr. Penny and Mr. Wierman had, and I wanted to know what about the pay for my beets. I expected to get the money to pay my taxes, and I wanted it out of those beets, and I was to have my pay out of the first shipment of beets, and he said: 'There will be no trouble. You will have the money to pay your taxes. As soon as the beets are in, you will get your pay.'

"*Q*. You understand he promised it on behalf of the company?

"*A*. Yes, he did. * * * Certainly, I knew nothing about Mr. Penny at that time. I was holding the company responsible for my beets.

"*Q*. Did you at that time, or have you at any time since—that is, at the time this promise was made to you—held Mr. Wierman for this amount?

"*A*. No, sir; I hold the Bay City Sugar Company."

Mr. Frank Wierman testified:

"*Q*. What did Mr. Penny say to you?

"*A*. He said that the company had taken charge of this crop with the understanding that they should pay those claims, and that for me not to make any trouble about moving the crop, and the company would see that I got my pay, they would pay me. I said: 'I want to know that I am going to get my pay. My team has worked hard with the understanding that I should have my pay when the beets were harvested.' And he says: 'You rest there. You will get your pay. The company will pay you.' And he says: 'We want to receive those beets in, and the sooner they are in the sooner you will get your pay.' I says: 'If that is the case, all right. What I want to know is that I am going to get my pay for the work.' I worked further for Mr. Penny.

"*Q*. What was your understanding about your pay that was coming to you when you went to work for Mr. Penny?

"*A*. My understanding was that I was to go along and get those beets in, and the sooner we got them in the sooner I would get my pay, and he called me to make out my bill of work done previous to that, and that he would take it in and bring it back with him, and I made out my bill and gave it to him."

He testified that from then on he looked to the company, and not to his brother, for his pay. He then quit working for his brother, and with his team worked for the company until the crop was harvested.

Mr. Gary, who leased some of the land, testified that he had heard of the arrangement between the company and Wierman.

"I did not attach the beets that year. I had a conversation about attaching. I was going over to Breckenridge to attach the beets. They were on the ground most of them. There was one or two loads I guess in the car. I saw Mr. Penny at that time. He said: 'Don't attach the beets. They want them immediately, and as soon as Bay City gets the beets they would pay me.' I did not attach the beets. I refrained from attaching them because of this promise.

"*Q.* Did you look to the sugar company then for your pay?

"*A.* I did. * * *"

On the cross-examination he testified:

"Mr. Penny came down, I think, along about the 1st or middle of November. I could not remember how many times I talked with Mr. Penny about it. More than a dozen times I spoke to him about that same thing. I think the first time was when I came over and was going to stop the beets. Then the conversation began. I made the bargain that if he would live up to his agreement I would not stop the beets, and then I was going to stop the beets. I was going over to stop the beets, and he said: 'If you will not stop the beets, and they send them down there, he would pay me—the company would pay me—right up.' He thought he had about three loads in the car. He says: 'Let them go, and when I go down with the beets I will bring a check back.' I think Mr. Sensabaugh and James Wierman were there. Sensabaugh said: 'Yes, let them go, and the company will see that you will have your pay. The company is going to pay for these things, the whole thing, pay up everything against the crop.' They all said the same thing. Jim says: 'Yes, let them go. The company will see that you have your pay.' So I thought, if the company was good, that was all I wanted."

It is true Mr. Penny denies all this testimony; but that presents a question of fact for the jury, if the testimony was competent, as we think it was. We also think the jury were justified in saying it created a liability upon the part of the company. Mr. Penny was sent to Breckenridge to do a thing which necessarily involved changes in the written contract. It is conceded he was clothed with the power of hiring men and teams and the taking over of the crop. He was clothed with the necessary power to do this. He did do it, and in order to do it the jury found he made the contract sworn to by the witnesses for the plaintiff. His apparent power could not be limited by secret instructions, so as to preclude those who dealt with him, while apparently clothed with all necessary power to carry out the object he was set to do, from recovering. As the result of his agreement his company was allowed to take the entire crop at once, without any attempt on the part of the other creditors to enforce their claims. The company has obtained the results of what it claims was the unauthorized act of its agent, and seeks to avoid the liability created thereby. This it cannot do. See *Busch* v. *Wilcox*, 82 Mich. 315.

We have examined the other assignments of error, but deem it unnecessary to discuss them.

Judgment should be affirmed.

BLAIR, J., concurred with MOORE, C. J.

GRANT, J. The contract between J. P. Wierman and defendant is given in full in my Brother MOORE's opinion. The record presents four questions:

(1) Did Mr. Penny, the defendant's agent, have authority to alter or change the terms of that contract?

(2) Even if Mr. Penny had such authority, was a contract of novation actually made between the plaintiff, his assignor, and the defendant?

(3) Was it competent for the creditors of J. P. Wierman, the plaintiff and his assignors, to testify that they looked to the defendant and not to Wierman for their pay?

(4) Was it competent for the plaintiff to show that defendant had paid other claims similar to his ?

1. By the terms of the agreement the title to the crop became vested in the company as soon as it began to grow. Hinbaugh and Gary, who rented parcels of their land to J. P. Wierman on which to raise beets, entered into contracts with the beet sugar company in terms the same as that of Mr. Wierman. They gave up their contracts and rented their land to Mr. Wierman. They were therefore fully cognizant of the defendant's rights under the contract. The plaintiff knew that his brother had a contract with defendant, but testified he was not conversant with its terms. Plaintiff testified:

"I didn't have any interest in the crop, merely that I was to get my pay when the beets were harvested."

He had no lien or claim of any kind upon the beets. He worked as a laborer for his brother. The plaintiff and both of his assignors testified that they knew nothing about Mr. Penny's authority, except what he told them. Under the contract between J. P. Wierman and defendant it was under no obligation to pay the rent or to pay plaintiff for services rendered his brother. The plaintiff's claim is that he and his assignors made a contract by which the defendant agreed to pay plaintiff for his past labor and his assignors for the rent. As stated by the learned circuit judge:

"The defendant complied fully with its contract, advanced the seed, advanced money, and when all the beets were harvested and delivered it was behind $400."

The judge stated also:

"The year was a disastrous one for the beet business; that Mr. Wierman had very little money of his own; that he put only a small amount into the business (about $60, paid to plaintiff); that in November it was seen that Mr. Wierman was not going to get out any beets, and that the defendant took possession with Mr. Wierman's consent, as it had a right to do, under the contract."

The contract expressly prohibited Mr. Penny from making additions or alterations therein. Such a provision is reasonable and wise, and dictated by common experience and a proper regard for the interests of the corporation and its stockholders. No prudent business man would do otherwise. The provision was clearly understood by J. P. Wierman and plaintiff's assignors. Mr. Penny was sent out, clothed with no other authority than to see that the beets of the numerous parties who had contracted to furnish them were shipped at the proper time. Plaintiff and his assignors are chargeable with knowledge that Mr. Penny must have had express authority or one necessarily implied or apparent to contract for his principal that it should pay the debts of another. Penny had no such authority. It is due to him to say that he expressly denies making any such agreement.

The beets contracted to be raised by Mr. Wierman were shipped to all appearances to defendant's factory the same as other beets were shipped. There was nothing to indicate to defendant, through its proper officers, that Penny had agreed to pay the debts of J. P. Wierman. It did know that Penny was getting in the beets and it was furnishing the money to pay the expense as was contemplated by the contract. Under these circumstances I think there was no evidence to be submitted to the jury as to the authority of Mr. Penny either to alter the original contract or to make a new one. Before Mr. Penny's statements were admissible his authority should have been shown. With his statements out of the record there is nothing tending to show authority. *Hatch* v. *Squires*, 11 Mich. 185; *Wells* v. *Martin*, 32 Mich. 478; *Danaher* v. *Garlock*, 33 Mich. 295; *Bond* v. *Railroad Co.*, 62 Mich. 643; *Three Rivers Nat. Bank* v. *Gilchrist*, 83 Mich. 253; *Davis* v. *Kneale*, 97 Mich. 72; *Gore* v. *Assurance Co.*, 119 Mich. 136; *Nephew* v. *Railroad Co.*, 128 Mich. 599. The apparent power of an agent is to be determined by the acts of the principal, and not by the acts of the agent. 1 Am. & Eng. Enc. Law (2d Ed.), p. 990,

and note; *Mechanics' Bank* v. *Railroad Co.*, 13 N. Y. 599. No act of the principal in this case appears upon this record to show that it clothed its agent with authority to pledge its liability to pay the debts of third persons. The question here is one of original authority. There is no evidence of ratification.

2. The second and third questions may be treated together. Novation exists only where there is an extinguishment of the original debt, the creation of another, and the assent of the three parties to the new contract. 21 Am. & Eng. Enc. Law (2d Ed.), p. 666; *Dean* v. *Ellis*, 108 Mich. 240. The contract of novation is to be determined by the written document when in writing, and by the declarations of the parties when resting in parol. The creditor cannot create such a contract by his subsequent statements that he looked to the new debtor, and not to the original. This would be to admit in evidence the creditor's secret understanding. What was said and done at the time must determine whether there was a contract of novation. The testimony, therefore, of these parties that they looked to the defendant, and not to Mr. J. P. Wierman, was incompetent. Plaintiff testified:

"I and my brother and Mr. Penny never had any agreement where we three were all together. What my brother and Mr. Penny said to each other I do not know. I did not give him [my brother] a receipt of any kind for his bill. I did not discharge him in any way from his bill."

Mr. Hinbaugh, after testifying that his arrangement with Mr. J. P. Wierman was that he was to have his pay out of the first shipment of beets, stated his conversation with Mr. Penny as follows:

"I told him that the way the understanding Mr. Penny and Mr. Wierman had, and I wanted to know what about the pay for my beets. I expected to get the money to pay my taxes, and I wanted it out of those beets, and I was to have pay out of the first shipment of beets, and he said: 'There will be no trouble. You will have the

money to pay your taxes.    As soon as the beets are in you will get your pay.'"

On cross-examination he testified:

"I never had any agreement with Mr. Penny in the presence of James Wierman."

Mr. Gary testified:

"*Q.* Did you from that time and have you since relieved Mr. Wierman from that claim?
"*A.* No, sir.
"*Q.* What did you answer?
"*A.* No, sir.
"*Q.* Did you get my question?
"*A.* Yes; I did.  *  *  *  I did not then give Mr. Wierman a receipt in full.  I did not say anything that would indicate that I would receipt in full for his bill at that time, nor at any other time.  *  *  *  As far as Mr. James Wierman is concerned, the account stands the way it did."

We think that the conversations did not justify the finding that there was a contract of novation. Nothing was said by either of the claimants, by which it can be legitimately inferred that they had released or intended to release Mr. J. P. Wierman from his obligation. There being no novation, there was no consideration for the promise, alleged to have been made by Mr. Penny, that the defendant would pay the claimants if they would make no trouble. Neither of the parties had any lien or ground for attachment, so far as this record shows; and threats and forbearance to bring attachment suits under such circumstances would not be a sufficient consideration for the promise. *Rood* v. *Jones,* 1 Doug. (Mich.) 188; *Holland* v. *Hoyt,* 14 Mich. 238; *Taylor* v. *Weeks,* 129 Mich. 233. Only one of the claimants, however (Mr. Gary), testified that he made any promise not to attach the beets if his claim were paid.

3. Plaintiff was permitted, under objection and exception, to testify that "the company through its agent paid other claims similar to his." The precise question arose

in *Davis* v. *Kneale*, supra. It was there held, speaking through my Brother HOOKER, that evidence of the making of similar agreements was inadmissible, either to show the agent's authority or to raise an inference that the agreement in controversy was made.

The judgment is reversed, and a new trial ordered.

HOOKER, OSTRANDER, and MCALVAY, JJ., concurred with GRANT, J. MONTGOMERY, J., concurred on the second ground stated.

CARPENTER, J., took no part in the decision.