GEORGE C. ANDERSON, Appellant, v. CHARLES A. PATTEN, Appellee.

**Principal and agent:** POSSESSION OF PROPERTY BY AGENT: AUTHORITY
1 TO SELL. The mere possession of property by one not the owner is not sufficient to establish agency or authority to sell on his part; but the property may be left with him by the owner under circumstances indicating that it was for sale. Thus where it conclusively appeared that plaintiff's agent was authorized to dispose of buggies through a scheme of selling coupon books at a race meeting, and after the meeting the buggies were left in his possession, the question of his then actual or apparent authority to sell for cash was for the jury.

**Same:** APPARENT AUTHORITY. An agent's apparent authority to sell
2 an article belonging to his principal must be determined by the acts of the principal and not those of the agent; and a third person can only rely upon actual apparent authority, and he must deal in reliance thereon in good faith and in the exercise of reasonable prudence.

**Evidence:** STRICKEN WHEN NOT RESPONSIVE. A party is entitled to
3 have an answer not responsive to his inquiry stricken out for that reason.

**Principal and agent:** AUTHORITY OF AGENT TO SELL: EVIDENCE. In
4 this action to recover a buggy which plaintiff's agent had sold defendant at the close of a fair or race meeting, which had been exhibited and the agent had attempted to sell by means of a coupon scheme, it was competent for plaintiff to show a custom of exhibitors to sell such articles as they could during the meeting or after its close, as bearing on the agent's authority to sell.

**Same:** INSTRUCTION. It is not the law that one in good faith pur-
5 chasing property from a person simply intrusted with the same acquires as good title as though he had dealt with the real owner; and the instruction to that effect in this case was erroneous.

**Same:** AUTHORITY OF AGENT: EVIDENCE. The declarations of an agent
6 are not competent on the question of his authority; and the
instruction in this case permitting the jury to consider such
declarations along with the other evidence in the case was erro-
neous. .

*Appeal from Linn District Court.*—HON. MILO P. SMITH,
Judge.

THURSDAY, OCTOBER 24, 1912.

ACTION in replevin for the possession of a buggy.
There was a judgment for defendant, from which plain-
tiff appeals.—*Reversed.*

*Voris & Haas,* for appellant.

*F. L. Anderson,* for appellee.

LADD, J.—There were horse races at Marion July 4
and 5, 1910, and plaintiff was in attendance. He shipped
three buggies in the same car with his horses and placed
in charge of them one Willard, who arranged for the stor-
age of two of them in a shop and; after obtaining per-
mission of the city authorities, exhibited the other near the
park. Willard had accompanied plaintiff from Des Moines,
where the latter had bought the buggies, in order to carry
out a scheme entered into at the suggestion of Willard,
and which is best explained by plaintiff:

The method of handling the coupons was this:
There was a book of coupons with five coupons in a book,
and the book sold for .$20. A party purchasing one of
the books would sell a coupon for $4, and the purchaser
would send the coupon with $20 into the office, and his
name was taken, and every coupon that came from his
book was credited to the owner of the book, and when
he had disposed of five books of coupons he had a buggy

shipped to him from the factory. The coupons in all cases had to be sent in so that a record could be kept of them there.

A purchaser of coupons in this way could only get his buggy by sending his coupons in to the office and getting credit for them. The buggy of course, had to be shipped from the office. I had made arrangements with the Capital City Carriage Company to procure the buggies from them as I needed them. The three buggies were shipped to Marion, to be shown as samples of the buggies that would be received on the coupons. There were three kinds of buggies; the factory price on one was $60, one $48.75, and one $40. The best buggy was the sample of the buggy that would be sent out on the sale of the five coupon books. One selling four books of coupons got the second grade of buggy; and for the sale of three books the cheapest buggy was sent. If only two coupon books were sold, the seller would get a set of double harness. For disposing of one book he would get a single harness. Every coupon was redeemable in merchandise.

These coupons were to be redeemed by the Uncle Sam Buggy Company, which was plaintiff. Willard was to start the sale, and as his commission was to receive $4 for every book sold. A couple of days after the races, Willard sold the buggy to defendant for $50, and the parties have not been in communication with him since. The defendant, who had first seen Willard exhibiting the buggy near the park and at the fair ground, testified that it was customary for those exhibiting at the fair ground to sell what they could after the race meeting or fair was over, and further:

Four or five days after I bought the buggy, the plaintiff, Mr. Anderson, came to my barn, and we talked the matter over. He said Willard had no right to sell it, only on a coupon order or coupon book, or something of that nature. I didn't understand the way they were selling the books. He told me he had entered into a contract with this man to sell these buggies; that he had bought the buggies himself and sent them here with Willard for him to dis-

pose of—he claimed strictly on some sort of a coupon order is the way they were to be disposed of—and said the buggies didn't belong to Willard; that they belonged to him. He said Willard proposed the scheme to him in Des Moines. He said Willard put up collateral of some kind to make him safe in the buggy deal, and he had written east to Washington to find out about the collateral, and it was a forgery, and he showed me a letter from Washington. I can't remember the contents of the letter, only that Mr. Willard was a fraud. Anderson showed me the letter, which was directed to his father at Des Moines. Anderson told me his father was a salesman or something for the Capitol City Buggy Company, and the buggies were to go back to the factory if not sold. He said he got suspicious of these securities, and that either he or his father wrote to Washington and received the letter back that Willard was a fraud, and that if he had telegraphed to Marion immediately on receipt of the letter Willard could have been detained before he got away from here. In that conversation with the plaintiff, he told me that Willard had entered into an agreement to sell these buggies here at Marion, and was to have half the profits, and they had to account to the factory $60 for this buggy, and the sale price was $100. I told plaintiff that if Willard was in possession of these buggies as agent, and selling them, I didn't see where he could come onto me for the buggy, or any damages whatever. He said they had lost enough money on Willard already, and they couldn't afford to lose any more, and wanted to settle with me, and that rather than have any fuss they would rather lose part of it, and if I would pay part of what the buggy was worth I might keep it. I don't know who he meant by 'we.' He said, 'We have lost enough already,' when speaking to me. He said Willard had authority to sell the buggy, the way I understood it for him.

On cross-examination he testified that plaintiff "told me that Willard was selling buggies for him on coupon orders, or something along that line, was selling coupon books, and something to the effect that Willard didn't have authority to sell the buggy, but that it was his business to sell the coupons. Anderson claimed to me that he had no

authority. He claimed he had authority to sell the buggy
on the coupon order. He did tell me, in effect, that Willard
didn't have any right to sell the buggy to me, but only had
a right to sell coupons, and he demanded that I pay for the
buggy; wanted to settle it. Said he was willing to lose
some if we could get together and settle. Didn't want any
costs or trouble; didn't want me to lose it all; and didn't
want to lose it all himself."

He also swore that in buying he was not aware that
plaintiff was interested in the buggy, but knew he was get-
ting it for less than factory price.

The plaintiff's version of the talk was that he explained
to defendant the arrangement between himself and Willard
as previously recited.

Two issues were submitted to the jury: (1) Whether
Willard had actual authority to sell the buggy, and, if not,
(2) whether he had ostensible authority so to do.

I. The scheme concocted seems to have been in the
nature of an endless chain as applied to customers, and,
had it worked as well in fact as in theory, probably nearly
every one by this time would have become a
patron or victim of plaintiff, acting under a
fictitious name. People did not seem to
take kindly to the net spread for them, how-
ever, and Willard found it easier to sell buggies than
books with which to procure them. Of course, the mere
possession of the buggies by Willard was not alone enough
to establish agency or authority to sell on his part. *Baehr
v. Clark,* 83 Iowa, 313; *Gilman Oil Co. v. Norton,* 89
Iowa, 434; 1 Mechem on Sales, section 156; 31 Cyc. 1252.
But the buggies were left with him by plaintiff after the
races were over, under circumstances, in view of a custom,
indicating that they were for sale. Moreover, according to
defendant's testimony, plaintiff admitted that Willard had
them for disposition through selling books, although he
testified seemingly to his own conclusion, that "the buggy,

I. PRINCIPAL AND
AGENT: posses-
sion of
property by
agent: author-
ity to sell.

of course, had to be shipped from the office." That the jury might have found he was authorized to dispose of the buggy through the scheme of first selling books and exchanging it for these can not be doubted; and, if he might do this indirectly, it was fairly to be implied that he might do so directly for cash. The plaintiff had left him in charge of the buggies a long distance from his office without having disposed of the books entrusted to him, and we are of the opinion that whether the sale for money was within the scope of his authority was for the jury to decide.

II. Apparent authority always must be determined by the acts of the principal, and not those of the agent. *Wierman v. Bay City Sugar Co.*, 142 Mich. 422 (106 N. W. 75); *Dispatch Printing Co. v. National Bank*, 115 Minn. 157 (132 N. W. 2). "The authority must have been actually apparent to the third person, who, in order to avail himself of rights thereunder, must have dealt with agent in reliance thereon in good faith and in the exercise of reasonable prudence." 31 Cyc. 1333. The defendant testified that in buying he relied solely on what Willard said and upon the fact that he was in possession of the buggy. Therein he did not exclude the circumstances of such possession, such as that Willard had been exhibiting it at the race track and at the park, that he had remained with the buggies after the races were over, and the custom of buggies being left for sale thereafter. These matters, in connection with Willard's possession were enough to carry the issue to the jury as to whether he was clothed with such ostensible authority to sell as that the defendant was justified in relying thereon.

III. Byers after testifying to the storage of two crated buggies by Willard in his father's wind mill shop, and, on cross-examination, that Willard had paid nothing, was asked: "Of course, you didn't know who Mr. Willard was working for, if anybody, did you? A. When he came there, he

*2. SAME: apparent authority.*

*3. EVIDENCE: stricken when not responsive.*

told me he was interested in these buggies." Plaintiff moved the answer be stricken as not responsive and as hearsay, and this motion was overruled. This was error. The answer was not responsive, and, for that reason, the party interrogating was entitled to have it stricken and the witness required to respond to the question as propounded.

IV. The defendant, after testifying to the exhibition of the buggy near the park and at the races by Willard and the purchase of the buggy of him, was asked whether or not "you are acquainted with the custom and usage of men exhibiting buggies at race meetings and fairs about Linn county and in this part of the state, with reference to selling the same at the places they are exhibited after the race meeting is over?" This was objected to as incompetent, irrelevant, and immaterial and not tending to support any issue in the case, and as calling for the opinion of the witness, and the objection overruled. "A. Yes; I am. Q. What is the custom?" A like objection was overruled, and the witness answered: "It is the custom to sell what buggies they can after the fair is over, or during the fair." The evidence was admissible as bearing on whether defendant in buying relied on Willard having authority to sell, and, if shown to have been general or known to plaintiff, would have borne on whether he had authorized Willard to sell. *Kaufman v. Manufacturing Co.,* 78 Iowa, 679; *Hichhorn v. Bradley,* 117 Iowa, 130.

*4. Principal and Agent: authority of agent to sell: evidence.*

V. Exception is taken to the fifth instruction, which reads:

A person dealing with an agent in regard to personal property intrusted to the latter by the principal, without knowledge that the property is not owned by the agent, but supposing him to be the owner thereof and the principal in the transaction with him, will possess all the rights he would have acquired had the transaction been with the real owner. If you find in this case that the plaintiff had committed the buggy in question

*5. Same: instruction.*

to the hands of Willard for exhibition or sale in a particular manner, and that Willard took possession for that purpose, and as a reasonable man plaintiff knew, or should have known, that the possession and control over the property by Willard would lead a purchaser without knowledge of the true owner to buy from Willard in a manner different from that contemplated by him and Willard, and the defendant, without notice that the plaintiff was the real owner, purchased the buggy from Willard at a reasonable price, then he acquired title thereto, and you should find for him.

The thought sought to be conveyed in the first paragraph probably was that, though the purchaser may suppose the seller the owner, this will not obviate the application of the doctrine of ostensible authority; but, if so, the court was not happy in its expression, for the language employed in effect advises the jury that one purchasing property in good faith from a person intrusted therewith will acquire a good title as though he had dealt with the owner. Such is not the law, and the error is not obviated by what follows.

. The court told the jury in the second instruction, that "the statements or declarations of said Willard that he was such agent and had such authority to sell, or that he owned

6. SAME: authority of agent: evidence.

such buggy, or had an interest therein, if any such statements or declarations were made, are not alone competent to establish, and do not establish, such agency or authority." From insertion of the word "alone," the jury might have inferred that such declarations could be considered in connection with other evidence in determining agency on the part of Willard. For that purpose, declarations of the agent are not to be considered by the jury. *Hinkson v. Morrison,* 47 Iowa, 167.—*Reversed.*