HOMER GRISMORE, Appellee, v. CONSOLIDATED PRODUCTS CO., Appellant.

No. 45940.

SEPTEMBER 29, 1942.

H. F. Garrett, of Corydon, Lindley, Jones, Grant & Sebat, of Danville, Illinois, and Brammer, Brody, Charlton & Parker, of Des Moines, for appellant.

Albert V. Hass, of Chariton, for appellee.

BLISS, J.—The plaintiff, for 12 years or more, had been engaged in the business of hatching, raising, and marketing turkeys, with his place of business, at the time the matters complained of occurred, near Corydon, Iowa. The defendant, a corporation, with its place of business at Danville, Illinois, prepares and sells a turkey food, known as Semi-Solid Buttermilk, which is ordinary buttermilk with the water content reduced to 73 per cent of the product as sold. It also sold a product known as "E" Emulsion, used for feeding turkeys, very similar in composition to the first-mentioned product. M. F. Stewart, of Corydon, a man experienced in the raising and feeding of turkeys, was a regular salesman of the defendant, who sold to plaintiff 19 barrels of the buttermilk and one barrel of the emulsion.

Plaintiff alleged in his petition that: In the latter part of July 1939, the said Stewart, as the duly authorized agent of the defendant, solicited the plaintiff to purchase these products, and said the defendant had had a long and varied experience in the manufacture of its buttermilk products and knew the best methods of feeding them to turkeys to obtain the most beneficial results; Stewart stated to plaintiff the proper method of feeding it, which was not the method as then believed by the plaintiff; Stewart then stated to plaintiff that if he would permit him to remain with him for a day and show him the proper method of feeding the buttermilk, the turkeys would be greatly benefited and in no way harmed; plaintiff relied upon these statements and representations of defendant's agent and the claimed knowledge of the defendant as to the qualities of its product, and permitted Stewart to stay with him a day or so and feed the turkeys the buttermilk as recommended by Stewart and as directed by the defendant; as a result thereof, plaintiff lost many turkeys, and those that did not die were thrown off feed, lost weight, and were retarded in their growth, all to plaintiff's loss in the approximate sum of $2,900; and "the negligent and wrongful statements and misrepresentations on the part of the defendant, through its agent, M. F. Stewart, upon which the plaintiff relied, and the resultant feeding of the Semi-Solid

Buttermilk to the plaintiff's turkeys by reason of the plaintiff relying upon the said negligent and wrongful statements and misrepresentations, were the proximate cause of the plaintiff's injury and damages.''

Defendant filed an answer, in count 1 of which it admitted the respective businesses of the parties, and its manufacture and sale to plaintiff of the Semi-Solid Buttermilk as alleged, and denied all other allegations. Count 2 of defendant's pleading was a counterclaim based upon the sale of the product to plaintiff and the nonpayment of the purchase price. Defendant prayed for judgment on its counterclaim, and the dismissal of plaintiff's petition. No other pleadings were filed. The court instructed the jury that the basis of the claim of plaintiff was not because of anything in itself impure or injurious in the product, but was the negligence of the defendant, through its agent, in directing the feeding of the turkeys the buttermilk in the amount and at the time and in the manner stated, and in so feeding them, and that if the doing of these things was within the scope of the agent's authority and was the proximate cause of the injury and damages, and the jury should so find, it should return a verdict for plaintiff in the amount of the damages suffered. The jury returned a verdict for the plaintiff of $2,000, after crediting upon plaintiff's damages the amount owing on defendant's counterclaim. The defendant took no exceptions to any of the instructions. Its motions to direct a verdict at the close of plaintiff's evidence and at the close of all the evidence, and its motions for new trial, and for judgment notwithstanding the verdict, were all overruled.

Appellant assigns as error that the record fails to establish that appellee's loss was due to the feeding of the buttermilk; that the record failed to establish that anything Stewart said or did with reference to feeding the turkeys was within the scope of his authority; and, that the court erred in the admission of certain expert opinions and so-called expert-opinion testimony.

I. With respect to the first assignment, it is our conclusion that there was substantial evidence to sustain the jury's verdict that appellee's loss was proximately caused by the directing and the feeding of the buttermilk by Stewart. In July 1939, the appellee had approximately 14,000 young turkeys, hatched in

March and in the months following. Their appearance and the manner in which they ate gave indication of good health and freedom from disease. Stewart saw the flock the day before he gave them their first feeding of appellant's buttermilk, and he testified he saw nothing in their appearance indicating disease. The death loss in the flock had been very low. When the shipment of buttermilk arrived, the appellee waited two days until Stewart returned to superintend its mixing and feeding. Appellee had fed buttermilk some years before but used ten parts of water to one part of buttermilk. Stewart told him this was entirely too thin, and that the Minnesota turkey raisers fed it differently with good results, and he would show him how they fed it. He said that they poured it over the grain mash, and his company recommended that method of feeding. Appellee had fed his turkeys no buttermilk, and was giving them a dry mash consisting of bran, shorts, ground oats, ground corn, meat scraps, soybean meal, alfalfa meal, bone meal, calcium carbonate and salt. Stewart came out Wednesday morning, August 2d, but he thought the feed troughs were too full of mash and postponed using the buttermilk. He came the next day and put on some old clothes and prepared the buttermilk feed—three parts of buttermilk to one part of water. He had the appellee's men pour this quite thick mixture over the mash in the feed boxes. He used three quarts of the mixture to 150 pounds of mash. Friday morning, August 4th, Stewart again came to appellee's and went with the men to again mix and spread the buttermilk. The turkeys had not eaten all of the mash put in the day before, but more mash was put in and the buttermilk was spread as before. Stewart came out again Saturday to say goodby to appellee, but did not see him and had nothing to do with the feeding that day. The appellee saw some of the turkeys late Friday evening and thought they looked droopy. The next day they appeared very definitely sick. They were very weak. Their wings drooped. They did not eat. The droppings under the roosts looked as though whitewash had been splashed all over. Appellee telephoned for Stewart, and Mrs. Stewart got in touch with her husband at Mt. Pleasant on Sunday. Appellee had six pens of turkeys. In two pens he had 3,000 turkeys in each. In one pen he had 5,500, in another 900, and in two other pens he

had 700 and 600 turkeys. No buttermilk had been fed to the 1,300 turkeys in the two last-mentioned pens. The mortality in these two pens was just the normal death loss in a flock of turkeys. The pen of 5,500 turkeys had received the largest percentage of buttermilk, and their death loss was the greatest. The two pens of 3,000 each had been fed somewhat less than the pen of 5,500 and their death loss was less than the latter pen. The pen of 900 had received but one feeding of buttermilk and the rate of mortality was the least of any of the pens which had been fed buttermilk. Prior to the feeding of the buttermilk, the death loss of the approximately 14,000 turkeys had been from three to eight turkeys a day—a normal loss. The death loss of the entire flock was as follows: July 31st, 3, August 1st, 5, August 2d, none, August 3d, 4, August 4th, 7, August 5th, none, August 6th, 20, August 7th, 24, August 8th, 87, and on August 9th, 100. From then on the death loss mounted. The total deaths in three or four weeks were 1,200 turkeys. The entire flock which had been fed the buttermilk was afflicted with this white diarrhea. Numerically, they were 100 per cent sick. The 1,300 turkeys that had received no buttermilk had but a normal mortality. They had no diarrhea. They continued as normal, healthy turkeys, and, with the exception of the buttermilk, they were fed the same mash as the remainder of the turkeys. They experienced the same weather conditions as the other turkeys. One night there was a heavy rain, and the sick turkeys were so weak they could not get into the shelters or on the roosts. Because of their condition, about 2,000 of them were hauled into the brooders to dry them out.

No buttermilk was fed after Saturday, August 5th. In about two weeks, the turkeys that survived began to eat better and slowly improved, but many of them were stunted, all of them required a month or more of additional feeding, and averaged about a pound and a half less in weight when marketed than they would have normally. Some of the turkeys, both live and dead, were sent to Iowa State College for examination and posting. All of them had catarrhal enteritis, which is a severe inflammatory condition of the entire alimentary tract. Some had other poultry diseases. Later, others were posted with like results. But the undisputed record is that such diseases do not

334

attack a flock with such a sudden onset nor afflict the entire flock. The attack of disease usually spreads slowly, and many escape it entirely.

Each side used a number of experts as witnesses. The appellee had called two local veterinaries to examine and treat the birds. He also used as witnesses some turkey raisers and others who saw the sick turkeys. It was their opinion that the affliction of the turkeys was caused by feeding them too strong a solution of the buttermilk and too much of it, when they were not accustomed to it and were too young to be so fed. The appellant's experts testified for the most part by deposition. They never saw the turkeys, and had no personal knowledge of the conditions, and their testimony in general was that a buttermilk product, such as that of the appellant, was practically harmless as a food for turkeys, and one could not go wrong in using it, either diluted or undiluted, with or without mash, and that it was beneficial to both healthy and sick turkeys. Others of appellant's witnesses were not so sure about all of these matters.

We think there is substantial evidence to support the verdict of the jury that the death of and injury to the turkeys was proximately caused by the buttermilk fed to them by and according to the directions of the appellant's agent, Mr. Stewart.

II. With respect to the second assignment of error, we think the record made the issue involved therein one for the jury to determine. The burden of proving that Stewart was the agent of the appellant, and that what he said and did, as complained about by the appellee, was within the scope of his actual or apparent authority, was upon the appellee. First Trust JSL Bk. v. Noland, 221 Iowa 1305, 1308, 268 N. W. 69.

Whether the agency or the extent of the agent's authority was established were also questions of fact for the determination of the jury. First Trust JSL Bk. v. Noland, supra, 221 Iowa 1305, 1309; Joyce Co. v. Rohan, 134 Iowa 12, 14, 111 N. W. 319, 120 Am. St. Rep. 410; Chismore v. Marion Sav. Bk., 221 Iowa 1256, 1261, 1263, 268 N. W. 137; Dickinson County v. Mississippi Valley Ins. Co., 41 Iowa 286, 290; Hollis v. State Ins. Co., 65 Iowa 454, 458, 21 N. W. 774; Mendenhall v. Kallem, 191 Iowa 987, 990, 183 N. W. 422; Fishbaugh v. Spunaugle, 118

Iowa 337, 341, 92 N. W. 58, 60; Wright v. Iowa Light & Power Co., 223 Iowa 1192, 1195, 274 N. W. 892; 2 C. J. 564; 2 C. J. S. 1193, section 93; Ida County Sav. Bk. v. Johnson, 156 Iowa 234, 245, 136 N. W. 225; Fullerton Lbr. Co. v. Snouffer, 139 Iowa 176, 177, 117 N. W. 50; Johnson v. Northern Minn. L. & Ins. Co., 168 Iowa 340, 351, 150 N. W. 596, 600; Federal Land Bk. v. Union Bk. & Tr. Co., 228 Iowa 205, 211, 290 N. W. 512; Northwestern Mut. L. Ins. Co. v. Steckel, 216 Iowa 1189, 1198, 250 N. W. 476; Whitlach v. Bond & Mtg. Co., 199 Iowa 65, 71, 72, 201 N. W. 108, 111; Anderson v. Patten, 157 Iowa 23, 28, 137 N. W. 1050.

It is also fundamental law that whatever an agent says or does, within the scope of his actual or apparent authority, is the act of and binds his principal. Ellison v. Stockton, 185 Iowa 979, 984, 170 N. W. 435; Wright v. Iowa Light & Power Co., supra, 223 Iowa 1192, 1196. And this is true even though the agent's act be tortious. Dunshee v. Standard Oil Co., 165 Iowa 625, 630, 146 N. W. 830; 3 C. J. S. 146, 151, section 236; White v. International Textbook Co., 173 Iowa 192, 194, 155 N. W. 298. Conversely, there is no liability on the principal for acts of the agent beyond his authority. Fullerton Lbr. Co. v. Snouffer, supra, 139 Iowa 176, 177.

In the case before us, the question of apparent authority is probably not present, as the appellee had no prior dealings with the appellant, nor knowledge of conduct of the latter indicating the authority of Stewart, upon which appellee was entitled to rely.

Apparent authority must be determined by what the principal does, rather than by any acts of the agent. Anderson v. Patten, supra, 157 Iowa 23, 28; Boylan v. Workman, 206 Iowa 469, 473, 220 N. W. 49.

Whether the appellee was entitled to recover depends upon whether the acts of Stewart were within the actual authority of the appellant. Actual authority includes both express and implied authority. 2 C. J. S. 1182, 1187, section 91.

"Implied authority is said to be actual authority circumstantially proved,—the authority which the principal intended the agent to possess." Nertney v. National F. Ins. Co., 199 Iowa

1358, 1361, 203 N. W. 826, 827. See, also, Fillgraf v. First Nat. Ins. Co., 218 Iowa 1335, 1341, 256 N. W. 421.

Appellant never expressly admitted that Stewart was its agent. It denied the allegation by its answer. In its counterclaim, it alleged the sale of the buttermilk to appellee but did not allege who sold it. Neither did it, by pleading or evidence, attempt to show just what authority Stewart had. Of course, the burden was upon the appellee to show that what Stewart did was within his authority. But we have, on occasion, mentioned such failure on the part of the principal as a matter of some significance. See Fishbaugh v. Spunaugle, supra, 118 Iowa 337, 341; First Trust JSL Bk. v. Noland, supra, 221 Iowa 1305, 1306, 1309; and Muntz v. Travelers Mut. Cas. Co., 229 Iowa 1015, 1019, 295 N. W. 837. Stewart testified that he sold the buttermilk to appellee, and admitted that he gave directions to appellee as to the proper way to feed it, and that he agreed with appellee to come to his turkey farm to show him how the buttermilk should be diluted and fed, and that he directed the mixing and feeding on August 3d and 4th. He testified that he did this as a personal favor and not as an agent of the appellant. He did not testify that what he did was beyond his authority, or otherwise than what he usually did in selling appellant's product.

Charles W. Weedeman, appellant's nutritionist, and the one in charge of its experimental farm, testified:

"I have never fed buttermilk to ten week old poults [young turkeys] that had never had buttermilk before *but our salesmen have*." (Italics ours.)

This is quite significant and informative testimony, indicating very definitely that the salesmen of the appellant very likely had express authority, and most certainly had implied authority, to give directions how to mix and feed, and to feed, the buttermilk to the young turkeys of buyers and of prospective buyers. On August 19, 1939, appellee wrote a letter to the appellant informing it of the purchase of the buttermilk from Stewart, and that his experience in feeding buttermilk in the past had been bad, and he did not know how to feed it, and that Stewart came and stayed a day or so and showed him how to

feed it. In this letter he informed them of the disastrous result of the feeding, and that he expected to bring suit unless settlement was made. The record is silent as to whether any reply was received. But, once in August, and about a month later, in September 1939, Mr. Sleichter, of Ames, Iowa, in the sales department of appellant, called upon the appellee. The turkeys were still dying at the time of both calls. His testimony was:

"I came down strictly on the matter of service to help determine and find out what was the cause of the loss."

The appellee testified that it was the custom of salesmen selling or attempting to sell him turkey feed, to tell him about the merits of their merchandise, and how to feed it.

The extent of an agent's authority is usually to be ascertained by fair implication, from the relations of the parties, the nature of the business of the agency, the service to be rendered, the purpose or transaction to be consummated, and the surrounding circumstances. Bissell v. Spring, 179 Iowa 1005, 1011, 162 N. W. 245, 247; Johnson v. Northern Minn. L. & Ins. Co., supra, 168 Iowa 340, 351, 150 N. W. 596; Whitlach v. Bond & Mtg. Co., supra, 199 Iowa 65, 71, 201 N. W. 108.

"The powers of the agent are, prima facie, coextensive with the business intrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals." Union Mut. L. Ins. Co. v. Wilkinson, 13 Wall. (80 U. S.) 222, 235, 20 L. Ed. 617, 623.

The act of an agent is within the granted or implied authority of his principal, and within his course of employment, when it was done in endeavoring to promote the principal's business, and was of such a nature as was usually, reasonably, properly, and necessarily incident to the duties and purposes of the agency. A principal rarely can, and seldom does, direct an agent in all of the details of the work to be done, or the object to be accomplished. He usually selects as his representative one in whose judgment he has confidence and trusts him to accomplish the purpose of the agency by methods reasonably necessary, and of a nature ordinarily used in the particular business. See 2 C. J. S. 1227–1229, section 99.

"Every general power implies every particular power

reasonably necessary to its exercise or performance. Whatever matters directly appertain to, and are necessary parts of, an authorized transaction may fairly be said to be within the scope of the agency. * * * Every grant of authority for any stated purpose includes an authorization of the usual and appropriate means for accomplishing the primary purpose indicated. Acts conforming to the usual practice of other agents engaged in that line of business are within the authority, although not among those specifically and explicitly authorized by the agency agreement." 2 C. J. S. 1229, 1230, section 99.

"Every delegation of authority includes by implication, whether the agency is general or special, all such incidental authority as is necessary, usual, and proper as a means of effectuating the main authority conferred. In other words, an agent expressly authorized to do a particular act or acts or conduct a particular transaction has implied authority to do acts which are incidental to, usually accompany, or are reasonably necessary to, the accomplishment or performance of the principal act or transaction delegated." 2 Am. Jur. 70, section 86, and authorities cited.

Under the principles of law stated and the facts shown by the record, we think there is evidence of the necessary weight and character to sustain the allegations of the petition and the finding of the jury, that the acts of Stewart in instructing and demonstrating how the buttermilk should be prepared and fed, and in supervising its feeding, were within the scope of his authority as agent.

It appears from the record that the successful raising of turkeys for market is a task of considerable care and difficulty. The proper feeding of turkeys requires particular knowledge and experience. This appears to be especially true of buttermilk. Instruction on how to feed it reasonably appears to be a proper, usual, and essential factor in the sale of the product. Selling it was the business of the appellant and the occupation of Stewart. The appellant conducted an experimental farm, and employed chemists, nutritionists, and others experienced in the feeding and raising of turkeys, in order to prepare a better product and to be better able to convince turkey raisers of its

worth. In such an endeavor it was the proper, natural, reasonable, and ordinary thing to do, to inform, instruct, and demonstrate to turkey raisers their methods of feeding the buttermilk. What Stewart did was a part of the transaction; it was an inducement to the sale.

Appellee testified that it was the custom of feed salesmen who dealt with him to give such instructions. There is no rebutting evidence that such is not the custom. The other salesmen of appellant fed buttermilk to young turkeys in the course of their work. In our judgment, the question of whether the acts of Stewart were within the scope of his authority was for the jury.

III. The remaining assignments of error have to do with the admission of expert-opinion testimony. Each side introduced much of this kind of testimony. The witnesses, from various parts of the country, both by education, experience in raising turkeys for sale as poults and on the food market, or positions held by them, were apparently well qualified. Most of this testimony was introduced with little objection, because of its character, or the qualification of the witnesses. Not until appellee's last expert witness in rebuttal was the objection made that any question to any expert called for any answer which was a so-called invasion of the province of the jury. Up to that time many questions were asked calling for expert opinions as to whether the sickness and death of the turkeys *were caused* by the buttermilk and the way it was fed, or by various poultry diseases, or by mould in the feed. Opinions were asked and given as to what was the proper way to feed turkeys, and whether the way in which these turkeys *were* fed was a *proper* way. Opinions were given by appellant's experts that buttermilk could not injure turkeys, or cause catarrhal enteritis, regardless of their age, and whether it was fed to them diluted or undiluted, and with or without mash. A wide field of such testimony was covered, with little objection. They expressed opinions that the turkeys which received the most buttermilk would do the best, and that it would not injure their digestive tracts, and also that the proteins in the mash and the proteins in the Semi-Solid Buttermilk could not be causative agents of catarrhal enteritis, and that the age of the turkeys would make no difference, and that

neither the buttermilk nor the emulsion "would ever irritate or injure the mucous membrane of the digestive tract of a turkey." In answer to hypothetical questions setting out the identical manner in which the turkeys were fed by Stewart, these experts said that in their opinion the buttermilk would not and could not injuriously affect the turkeys, but would benefit them.

It appeared in the record that the turkeys in the different pens were of different ages, and there was a difference in the amount and the percentage of buttermilk in the food which they received. The 5,500 turkeys in the one pen were younger and also received more buttermilk than those in other pens.

It clearly appears that the digestive tract of a turkey is a very delicate organism, and that many of the numerous hazards of turkey raising are attributed to that fact, and that the successful raising of turkeys is not a job for a novice, but requires a knowledge of turkeys and long experience in raising them, not possessed by the average juror.

All of the evidence had been presented to the jury when the appellee called the witness Baughman in rebuttal. He had been raising turkeys over a period of 30 or 35 years. He had had experience in feeding buttermilk to turkeys. He thought he had fed them too much buttermilk at times. He had fed a mixture of one gallon of buttermilk to seven or eight gallons of water in a mash of 150 pounds. That was his judgment of the right-proportioned mixture. He had consulted with other turkey raisers. He was asked whether in his opinion condensed buttermilk, such as Semi-Solid Buttermilk fed to turkeys, acted as a laxative. Appellant objected to the question as incompetent, irrelevant, and immaterial, the witness not having shown himself competent to testify, not being an expert, not having shown the extent of his experience, if any. The objection was overruled. The witness then replied:

"I think so, yes, if it is fed too much. I am careful as to how much buttermilk is fed to turkeys."

The witness was then asked:

"Now, Mr. Baughman, in your opinion if there were six pens of turkeys and in each pen there was a large number of

turkeys, and in four of the pens of turkeys these turkeys were two to four months old, and one of the four pens was fed buttermilk in a greater proportion than the rest, and in three of the other pens buttermilk was fed to the other turkeys but not quite so much in proportion to the rest of the feed, and in two of the pens no buttermilk was fed at all, and that was fed for two or three days, and shortly and almost immediately after, the third day, the pen that received the most buttermilk started to get sick, practically all of them and started to die, and the pens that received a little less, they were not in such bad condition, and the pen that received the least was affected the least, and the two pens that didn't receive any didn't have any bad results, and in your opinion as a turkey raiser and the feeder of condensed buttermilk if such a condition as that did arise, what would you say in your opinion contributed or caused the * * * dying and falling off from feed and falling off weight of the turkeys?''

Appellant objected to the question as invading the province of the jury, incompetent, irrelevant, and immaterial, no proper foundation laid, and the witness had not shown himself competent to testify. The objection was overruled. This question was then asked without further objection:

''What would you say would be the cause under those conditions?'' He answered: ''Well, I would say it would be caused from buttermilk.''

No motion was made to strike at this time, but during the cross-examination, appellee moved ''to strike everything this witness said * * * as to the effect on any of the birds outside of what he actually has experienced.'' The court said:

''Well, we have had a lot of expert testimony on this turkey business. I believe I will let it stand along with the rest.''

Appellant assigned error on the admission of this testimony because (1) the purported expert opinion was not predicated on any basis of scientific knowledge or skill, and (2) it invaded the province of the jury.

The first division of the assignment was not within any ground of the objection. Whether the question called for an

answer concerning a matter which was not the subject of expert-opinion testimony was not called to the attention of the court. **However, we think the question was not** vulnerable to such an **objection.** While the question involved some matters about which a layman could draw an inference by reasoning, a witness experienced over many years in the raising of turkeys and the feeding of buttermilk, and having a knowledge of the characteristics of turkeys, the conditions which affect them, and the hazards of raising them, as this witness possessed, was better qualified to answer the question than the ordinary juror. One of the tests for the admission of an expert opinion is whether the subject matter is such, and the witness is so qualified, as to aid the jury in the proper determination of a question before them. We think that test was met.

The courts and other authorities uniformly agree that the receipt of opinion evidence, whether lay or expert, and the extent to which it will be received in any particular case, are matters resting largely in the administrative discretion of the court. 32 C. J. S. 86, section 449; 1 Wigmore on Evidence, 2d Ed., 1092, section 682. Courts should be, and are, very loathe to interfere with such discretion unless it has been manifestly abused to the prejudice of the complaining party. We have permitted opinion testimony in many cases on matters with which jurors might have some familiarity, but where the witness, because of his greater knowledge, experience, and familiarity with the subject, might be of help to them. We think there is no merit in this ground of the assignment of error.

With respect to the second ground that the question and answer invaded the province of the jury, the appellant argues:

"It is elementary that an expert witness cannot be allowed to express an opinion on the ultimate question to be determined by the jury. To permit an expert to express an opinion on the ultimate fact to be submitted to the jury would leave nothing for the jury to determine. If the rule were otherwise, the answer of the witness would decide the whole case."

In support of the proposition, Crouch v. National Livestock Remedy Co., 205 Iowa 51, 58, 217 N. W. 557, and Justis v. Union Mut. Cas. Co., 215 Iowa 109, 244 N. W. 696, are cited.

In the latter case, a number of the decisions of this court sustaining the contention of the appellant are reviewed. Other decisions of this court and many from other courts could be cited with like holdings. It would be difficult to find a subject in law in which there has been more judicial confusion and quibbling, both in our own court and in those of other jurisdictions. It would also be difficult to find a single subject that has been provocative of more useless appeals than the matter of expert-opinion testimony. In the early days of court procedure there was less need of expert-opinion testimony. But with the complexity of modern life, and with the amazing growth and advancement of a myriad of matters of science, art, mechanics, discovery, invention, and industry, which touch our daily life constantly on every side, a failure to make the fullest use of expert opinions in court procedure means, in a great many cases, a denial of proof, and, necessarily, a denial of justice. For too many years too many courts have so frowned upon expert-opinion testimony and have so restricted its admission and consideration that the triers of facts have been denied aid that was essential to a proper determination of litigated causes.

Our court has on many occasions taken the advanced stand, only to lapse on other occasions into the old ultraconservative and backward position. The modern tendency of the courts everywhere is to take a more liberal and rational view respecting the admissibility and scope of such testimony. This court early announced that, in all proceedings involving matters of a scientific, mechanical, professional, or other like nature, requiring special study, experience, or observation, or where the connection between the cause and the effect was a matter of specialized knowledge, not within the knowledge of laymen in general, expert-opinion testimony was admissible to aid the court or the jury in arriving at a correct determination of the litigated issue. There are many matters of scientific investigation and specialized knowledge in the fields of the professions, trades, business, industry, art, and other endeavors, where the minds of those not learned therein necessarily grope but blindly. Expert opinion in such cases is indispensable to aid the jurors in reaching a correct conclusion, and the fact that the matter

inquired about is a vital and controlling fact in the trial, or is even the ultimate fact which the jury are to pass upon and determine, is no reason why the opinion should not be received.

Opinion testimony, whether expert or nonexpert, is admitted as a matter of necessity. The general rule for the admission of opinion testimony, whether it be lay or expert, may be briefly stated thus: An expert's opinion is received because and whenever his knowledge of the subject matter is greater than the jury's, and aids them or is proper or essential to their information, while a lay or nonexpert opinion is received because and whenever the facts cannot be told so as to give the court or jury the information which the witness' observation has given to him, or when it is impracticable for a witness to state all of the many details which go to make up the mental and optical picture which he observed, so as to enable the jury to see what he saw. The lay witness has been permitted to supplement and characterize that picture by his opinion, which has been denominated as but a shorthand rendering of the facts. These exceptions, respecting both lay and expert testimony, to the cardinal rule of judicial proof that matters of fact should ordinarily be established by fact testimony, were thus both born of necessity.

The objection made in this case was that the admission of the opinion of Baughman invaded the province of the jury. A frequent variation of this objection is that the opinion would usurp the functions of the jury, or would determine the very fact or a vital fact inhering in the jury's verdict, or, in short, that it would pass upon and decide the ultimate fact. All of these objections stem from a misconception of the necessity and purpose of opinion testimony. Any such objection is not valid or tenable if the opinion called for is about a matter which is a proper subject of opinion testimony. No such an opinion can invade the province of the jury or usurp its functions, even though it passes upon a controlling fact, or the ultimate fact which the jury must determine. This is necessarily so.

Since opinion testimony is an exception to the rule that only fact testimony shall be received, it should, with respect to its reception, be treated the same as fact testimony, and no one has ever contended that testimony as to a fact was in-

admissible simply because it might be decisive of an ultimate fact.

This rule of evidence which we assert is neither new nor novel, nor is it unsound, even though it is contrary to the pronouncement of the court in the cited cases and in others. We have permitted the objection that certain opinion testimony and certain forms of opinion questions invade the province and usurp the functions of the jury, and pass upon and determine vital or ultimate fact issues before the jury, to become almost a fetish. The ablest writers and authorities on evidence have severely condemned these objections as being without any sound basis. Greenleaf, in one of his earliest editions, and repeated in 1 Greenleaf, 16th Ed., 551, criticized such objections in the following language:

"A more liberal tendency in this respect seems to be making its way in recent times; but the reports are overloaded with decisions of the sort that ought never even to have been called for; and a prominent feature in the application of the rule is the petty and unprofitable quibbling to which it gives rise. * * * It ought first, however, to be noticed that certain reasons or tests sometimes put forward for this rule are unfounded. (1) It is said that the witness is not to 'usurp the functions of the jury.' The answer is simply that he is not attempting to usurp them,—not attempting to decide the issue and thus usurp their place, but merely to give evidence, which they may or may not accept, as they please. Even though his opinion is admitted, it is not decisive, especially when it is considered that opinions might be given by witnesses on both sides. (2) It is sometimes said that an opinion is not to be offered on 'the very issue before the jury.' But this, as once remarked [Snow v. Boston & Maine R. R., 65 Maine 230], would rather 'seem to be a very good reason for its admission.' If the witness can add instruction over and above what the jury are able to obtain from the data before them, it is no objection that he refers to the precise matter in issue."

Jurors and witnesses have separate and distinct functions. It is the duty of the jury to decide issues of fact. A witness could not usurp that function or invade the province of the jury, by his opinion, if he wished. It may accept it wholly, or in part,

or reject it in toto. If the opinion meets with its approval it should accept it. The purpose of court trials is to ascertain the truth and rightness of the matters in issue, and the purpose of expert-opinion testimony is to instruct and aid the jury in ascertaining that truth, whether it be the ultimate fact or some minor evidential fact.

Wigmore has exhibited less patience than Greenleaf in his condemnation of these hackneyed objections. The phrase "usurping the function of the jury," he states is made to imply a moral or tactical unfairness on the part of the witness.

"In this aspect the phrase is so misleading, as well as so unsound, that it should be entirely repudiated. It is a mere bit of empty rhetoric. There is no such reason for the rule, because the witness, in expressing his opinion, is not attempting to 'usurp' the jury's function, nor could if he desired. * * * because the jury may still reject his opinion and accept some other view, and no legal power, * * * can compel them to accept the witness' opinion against their own. * * * Another erroneous test, prevalent in some regions, and nearly allied to the preceding one, if not merely another form of it, is that an opinion can never be received when it touches 'the very issue before the jury' * * * The fallacy of this doctrine is, of course, that it is both too narrow and too broad, measured by the principle. It is too broad, because, even when the very point in issue is to be spoken to, the jury should have help if it is needed. * * * Furthermore, the rule if carried out strictly and invariably would exclude the most necessary testimony. When all is said, it remains simply one of those impossible and misconceived utterances which lack any justification in principle." 4 Wigmore on Evidence, 2d Ed., sections 1920, 1921. See, also, Chapter 65, containing these sections.

Rogers on Expert Testimony, 1941, 3d Ed., section 31, quotes from International & Great Northern Ry. Co. v. Mills, 34 Tex. Civ. App. 127, 128, 78 S. W. 11, 12:

" 'The proper test of the admissibility of the testimony of experts * * * is not whether or not the opinion of the expert would prove the very fact to be found by the jury. The object of all testimony is to prove the very fact to be found by the

jury, and it is not usurpation of the powers of a jury to prove that fact.' "

Quoted with approval by the Texas court of Civil Appeals in Zurich Gen. Acc. & Liab. Ins. Co. v. Kerr, Tex. Civ. App., 54 S. W. 2d 349, 351. See, also, section 35 of Rogers on Expert Testimony, supra.

After commenting upon the frequency of these objections, the author, in 20 Am. Jur. 654, section 782, states:

"Assuming, however, that the issues in a case properly call for the admission of expert opinion testimony, there seems logically to be no wrongful invasion of the province of the jury in permitting an opinion to be expressed upon an ultimate fact where that fact is one which is properly a matter of expert opinion. In such case, as in the case of an eyewitness to a decisive fact, if the jury are satisfied of the trustworthiness of the evidence, the evidence may be conclusive of the issue, but they are not bound to accept the opinion or to render the verdict according to it. * * * It is certainly contrary to the unmistakable trend of authority to exclude expert opinion testimony merely upon the ground that it amounts to an opinion upon ultimate facts. The modern tendency is to make no distinction between evidential and ultimate facts subject to expert opinion. The courts consider that it is more important to get to the truth of the matter than to quibble over distinctions in this regard which are in many cases impracticable."

See, also, 20 Am. Jur. 731, 732, section 867; 32 C. J. S. 74, 75, section 446. A widely quoted comment is section 14 of 11 R. C. L. (Expert and Opinion Evidence). A short excerpt therefrom is:

"But it is evident that this supposed rule, when stated broadly as it often has been stated, involves great confusion of thought and leads to absurd consequences. It is certainly singular that a class of evidence which is admitted when it is only slightly pertinent should be rejected when it is of the highest pertinency. Irrelevancy is made a ground of admission, and relevancy of exclusion. * * * The rule leads to absurd results in its application."

348

In a comment note in 78 A. L. R. 757, attached to the report of State v. Steffen, 210 Iowa 196, 230 N. W. 536, 78 A. L. R. 748, the fingerprint case, the annotator, after mentioning a number of cases, including Martin v. Des Moines Edison L. Co., 131 Iowa 724, 106 N. W. 359, Sachra v. Town of Manilla, 120 Iowa 562, 95 N. W. 198, State v. Pillsbury, 195 Iowa 569, 192 N. W. 241, which uphold the objections, states: "It seems that the distinction is super technical, * * * " and after reference to the 11 R. C. L. 583 quotation, supra, says: "The rule excluding such evidence is predicated on the fallacious theory that it invades the province of the jury." The annotator continues with some very pertinent comment, and criticism of the majority opinion in the Steffen case.

The opinion of an expert is admitted in any case only from necessity, where some special knowledge is not possessed by persons in general and is not presumed to be possessed by the jury. How, then, can such an opinion invade the province of the jury, when without such testimony it could not function in that particular matter, or render an intelligent decision upon it?

Another matter which has given rise to much judicial confusion and absurd consequences is the form of the interrogatory to and the answer of the expert—whether he may be asked his opinion as to the fact of the matter, or whether he may be asked his opinion only as to the possibility or probability of the matter. There is no sound basis in law, reason, or common sense for decisions that a witness may state his opinion as to what "may," "might," "could," or "probably did" cause something, but may not give an opinion as to what "did," "will," or "would," cause it. The true rule is, and should be, that the witness may use such expression as voices his true state of mind on the matter, whether it be possibility, probability, or actuality. To insist that a witness confine his testimony to an expression of possibility or probability, when his real judgment or conviction is actuality, or fact, is unfair to the witness and the jury, and unjust to the party offering the testimony.

In Martin v. Des Moines Edison L. Co., supra, 131 Iowa 724, 739, 106 N. W. 359, 364, the deceased, while standing on a ladder, using a wrench in his right hand to tighten a burr on a rod extending from a switchboard to an iron beam overhead,

took hold of another rod with his left hand. His body immediately stiffened, with arms outstretched, and when the current was cut off, he fell to the floor dead. It was discovered later that the rod did have a ground connection. It was held error to permit plaintiff's expert to express an opinion that deceased received an electric shock before he fell, notwithstanding that was not the ultimate fact, and notwithstanding it was plainly evident that deceased had received an electric shock. Whether the negligence of defendant was the proximate cause of the decedent's death was the ultimate question for the jury to determine. The court said:

"It is an accepted rule that, while experts may testify as to what in their opinion *may* or *may not* have been the cause of a given result or condition, it is not permissible for them to give their opinion as to the ultimate fact which the jury is organized to determine." (Italics supplied.)

Many cases are decided because the jury accepted as true the direct testimony of a witness as to a particular item of fact. Why should it not be given the opportunity to decide a case, and the ultimate fact, upon the unequivocal opinion of an expert on a matter on which he is fully informed, and the jury have no information except his opinion? Since expert testimony is admitted to aid the jury, they are entitled to its full aid. If the witness is confident of his conclusion, let him say so. If it is but a probability in his judgment, let him say so. If it is but a possibility in his mind, let him say so. But do not compel him to say it is only a possibility when he believes it is an actuality. If the latter is the way he feels about it, the jury wish to know it and should know it. The Tennessee court expressed this thought in National Life & Acc. Co. v. Follett, 168 Tenn. 647, 658, 80 S. W. 2d 92, 97:

"If it is necessary for a jury to have the advice and opinion of an expert witness in order to draw a proper conclusion from certain facts, a definite and positive expression from such a witness would be much more helpful to the jury than a qualified expression. The opinion is not to be received at all upon an ultimate issue of fact, if the jury is qualified to pass upon such

an issue. However the opinion be phrased or formulated, it remains an opinion, which the jury is at liberty to reject. To restrict the expert's expression, however, to the subjunctive mood in addition to detracting from the force of the opinion tends to confuse the jury in weighing the testimony of the witness. Such mode of expression indicates that the witness lacks conviction when, as a matter of fact, he may be entirely convinced.''

The opinion cites in approval our own case, Bird v. Hart-Parr Co., 165 Iowa 542, 545, 146 N. W. 74, in which we held it was proper to receive the opinion of an expert as to what *caused* the pain.

The Illinois court at one time held in accord with appellant's contention. It has now held repeatedly to the contrary. In Chicago Union Traction Co. v. Roberts, 229 Ill. 481, 484, 82 N. E. 401, 402, the court said:

''The opinion is permitted to be given to enable the jurors to draw the inferences from the evidence which their want of knowledge would otherwise prevent. In this case the question was whether the appellee's condition was due to traumatism or other causes. It was a question for the jury to determine, but it was impossible for them to answer without hearing the opinions of physicians. These opinions did not invade the province of the jury. * * * It is entirely immaterial whether the witness testified that the injury was the cause of the condition, or that the injury was sufficient to cause the condition or might have caused it. In any event, the testimony was merely the opinion of the witness, given, as such, upon a state of facts assumed to be true. It still remained for the jury to determine the facts, and the opinion was nevertheless an opinion only, whether it states what did cause the condition or what might cause it. The question may be asked in either form.''

In language frequently quoted, Justice Mitchell, in Donnelly v. St. Paul City Ry. Co., 70 Minn. 278, 280, 73 N. W. 157, said:

''Neither do we appreciate the fine distinctions sometimes sought to be drawn between asking an expert whether, in his

opinion, certain causes might produce certain results, and asking him whether, in his opinion, they did produce such results."

Approved in Piche v. Halvorson, 199 Minn. 526, 272 N. W. 591, State v. Cox, 172 Minn. 226, 215 N. W. 189, and Lestico v. Kuehner, 204 Minn. 125, 132, 283 N. W. 122, 126.

The Missouri court formerly held as appellant here contends. In O'Leary v. Scullin Steel Co., 303 Mo. 363, 375, 260 S. W. 55, 59, these holdings were overruled. The question was whether the infection came from a bruised thumb or a boil. In an ably written opinion, the court said:

"The only evidence which, to the lay mind in the jury box, could be said to have any efficacy to point to one rather than the other as the cause of the infection, is that of experts. * * * It could not logically find the cause from the expert, testimony if the rule in question is applied to restrict expert opinion to what might or could result from the injury, since that does not necessarily go further than a possibility, and a mere possibility does not satisfy the burden of proof. * * * It may be said the jury may decide which of the experts it will believe and then find accordingly. The difficulty is that after the jury has determined which expert it will believe and credits him, it comes to nothing, because what it has concluded to believe is merely that a certain thing 'might or could' produce a stated result or condition. In this case the fact that a cause for which appellant is liable might or could have produced the diseased ulna does not show that a cause for which appellant was not liable did not cause it."

In Langenfelder v. Thompson (6/10/41), 179 Md. 502, 507, 20 A. 2d 491, 493, 136 A. L. R. 960 (see annotation on this question commencing on page 965), the court said:

"We adopt the prevailing view that the opinions of medical experts are admissible as to the cause which *produced,* or *probably produced,* or *might have produced,* a certain physical condition." (Italics ours.)

The opinion cites, in support of its holding, State v. Hessenius, 165 Iowa 415, 146 N. W. 58, L. R. A. 1915A, 1078 (see

brief in latter report), a leading case against appellant's contention.

In State v. Campbell, 213 Iowa 677, 695, 697, 239 N. W. 715, 724, 725, a question for determination was whether the bullet which killed the deceased was fired from the defendant's gun. This court held that it was no invasion of the province of the jury for the ballistic expert to state his " 'conclusion * * * that both of these bullets had passed through the same barrel.' " The court in that case sought to distinguish it from the majority opinion in State v. Steffen, supra, 210 Iowa 196, 230 N. W. 536, 78 A. L. R. 748, because in that case the expert "was asked to state *the fact,* instead of his belief, conclusion, opinion or best judgment" that the same finger made the fingerprint taken from the defendant, and offered as an exhibit, and the fingerprint on the glass from the broken pane of the store which he burglarized. (Italics ours.) We question the soundness of the reason. Regardless of how he phrased his answer, or whether he expressed it as a "belief," "conclusion," "judgment," "conviction," "opinion," or "fact," it was, nevertheless, but his "opinion," using the word in the sense of an inference from observed or communicated data, or inferred knowledge, and it was not the statement of a "fact," in the sense of original perception or immediate knowledge. It was conceded, of course, that the expert did not see the defendant shoot the deceased, and that he had no first-hand knowledge of who fired the bullet. Such so-called distinctions are too finely drawn for the decision of matters of so great importance, and for the reversal of judgments on jury verdicts. As said by Judge Gardner, speaking for the circuit court of appeals, in Cropper v. Titanium Pigment Co., 8 Cir., Mo., 47 F. 2d 1038, 1043, 78 A. L. R. 737, 744, 745:

"The purpose of a trial is to investigate the facts so as to ascertain the truth, and the modern· tendency is to regard it as more important to get to the truth of the matter than to quibble over distinctions which are in many cases impracticable, and a witness may be permitted to state a fact known to him because of his expert knowledge, even though his statement may involve a certain element of inference or may involve the ultimate fact to be determined by the jury."

In Goldfoot v. Lofgren, 135 Or. 533, 541, 296 P. 843, 847, opinion by Judge Rossman, the court said:

"It is impossible for a witness to usurp the province of the jury by merely expressing an opinion upon the very issue before it. His credibility, the soundness of his judgment, and the existence of the facts recited in the hypothetical question, upon which the opinion is predicated, always remain for the jury's determination, and unless all of them are resolved by the jury favorably to the proponent of the witness the latter's opinion will go for naught."

A decision many times cited and quoted from on the question before us is that of United States Smelting Co. v. Parry, 8 Cir., Utah, 166 F. 407, 410, in which Judge Van Devanter, speaking for the court respecting the expert opinion of a brick mason and builder of many years' experience as to the safety of a scaffold, to which opinion objection was made that it invaded the province of the jury, said (speaking of the objection):

"But such a statement is not to be taken literally. It but reflects the general rule, which is subject to important qualifications, and never was intended to close any reasonable avenue to the truth in the investigation of questions of fact. Besides, the tendency of modern decisions is * * * to give as wide a scope as is reasonably possible to the investigation of such questions * * * The most important qualification of the general rule before stated is that which permits a witness possessed of special training, experience, or observation, in respect of the matter under investigation, to testify to his opinion when it will tend to aid the jury in reaching a correct conclusion; the true test being, *not the total dependence of the jury upon such testimony,* but their inability to judge for themselves as well as is the witness." (Italics ours.)

In Sever v. Minneapolis & St. L. Ry. Co., 156 Iowa 664, 137 N. W. 937, 44 L. R. A., N. S., 1200, several questions were put to the expert, some calling for his opinion as to the *probable cause* of the injury, and others as to what *was the cause.* This court held that each question invaded the province of the jury, and, following the holding in Martin v. Des Moines Edison L. Co.,

supra, 131 Iowa 724, 106 N. W. 359, held that the question should be limited to what "may" or "may not," "might" or "might not," cause the injury. In Sachra v. Town of Manilla, 120 Iowa 562, 95 N. W. 198, there was an intimation that the rule might be broadened to include an opinion as to "probable" cause. This liberalization was accomplished in later decisions. See Kirby v. Chicago, R. I. & P. Ry. Co., 173 Iowa 144, 158, 155 N. W. 343, Strever v. Woodward, 160 Iowa 332, 141 N. W. 931, 46 L. R. A., N. S., 644. In Justis v. Union Mut. Cas. Co., supra, 215 Iowa 109, 116, 244 N. W. 696, 699, we reviewed the cases of this court supporting the decision in that case, but in concluding the opinion we appear to have slipped back to the holding in Martin v. Des Moines Edison L. Co., supra, for we say:

"The expert may be permitted, under certain circumstances, to express an opinion as to whether, in his judgment, a certain condition, arising in a scientific or technical field, *may have been brought about* from certain causes; but never may the expert be permitted to invade the province of the jury and express any opinion as to the ultimate facts to be determined by the jury." (Italics ours.)

In Crouch v. National Livestock Remedy Co., supra, 205 Iowa 51, 55, 217 N. W. 557, 559, action was brought to recover damages for loss of hogs caused by feeding a product sold by defendant. The question complained of was, "What, in your judgment, * * * caused the death and the injury to the animals * * * ?" The court said that the question was a clear invasion of the province of the jury, and was improper. This was not the *decision* of the court, however, as it was held that the objection to the testimony did not raise the question on appeal. The judgment for plaintiff was reversed because of error in permitting neighbors of plaintiff to testify to the injurious effect of feeding the remedy to their hogs, when there was no sufficient showing of identity of conditions.

These decisions of this court, referred to above, supporting the views of appellant, and also other decisions, including State v. Candler, 204 Iowa 1355, 217 N. W. 233, State v. Pillsbury, 195 Iowa 569, 192 N. W. 241, Hann v. Hann, 202 Iowa 807, 211 N. W. 495, Strand v. Bleakley, 214 Iowa 1116, 243 N. W. 306,

involving opinion testimony, are ridiculed and sarcastically criticized by Wigmore in his work on Evidence. See the footnotes to sections 1958, 1959, 1960, 1974, 1976 in the 2d Edition and 1934 Supplement, and the 3d Edition. In the footnote to section 1960, 1934 Supplement, page 831, in speaking of Strand v. Bleakley, 214 Iowa 1116, 243 N. W. 306, he states:

"This Court [Iowa Supreme Court] is among the most extreme in its subservience to the worship of the opinion rule; * * * ."

While the decisions of this court on the particular question before us cannot be reconciled and are far from harmonious, many of them disagree with Justis v. Union Mut. Cas. Co., and like decisions, and announce the correct rule. Among these decisions are State v. Morphy, 33 Iowa 270, 11 Am. Rep. 122 (opinion given as to the *cause* of, and what produced the inflammation of the brain); State v. Porter, 34 Iowa 131 (opinion given as to whether internal disease or external violence *caused* death); State v. Seymour, 94 Iowa 699, 63 N. W. 661 (opinion given as to whether injuries were inflicted by a club or were due to a fall); State v. McGruder, 125 Iowa 741, 747, 101 N. W. 646, 648 (where defense was insanity, opinion testimony was not limited to soundness or unsoundness of mind, but lay witness was permitted to give opinion that defendant was not capable of appreciating the difference between right and wrong. Speaking through Justice Ladd, the court said: "The mere fact that the jury will necessarily pass upon an issue does not necessarily render the inquiry of a witness improper; * * * "); State v. Wilson, 157 Iowa 698, 141 N. W. 337; State v. Hessenius, supra, 165 Iowa 415, 146 N. W. 58, L. R. A. 1915A, 1078 (defendant was charged with strangling his wife. He claimed she died from an accidental fall. Basing his opinion upon assumed facts, a doctor was permitted to answer the question, "What do you say in your opinion caused the death of that person?" The opinion, by Judge Withrow, ably discusses the question and unreservedly holds the question was proper. The decision has never been criticized or overruled, although there have been some attempts to explain or distinguish it. In the Justis case, supra, at page 113 of 215 Iowa, page 698 of 244 N. W., we quoted from

the Crouch case, supra: " 'It is true that, in State v. Hessenius
* * * we recognized an exception in a criminal case that in-
volved the death of a human being.' " Kirby v. Chicago, R. I.
& P. Ry. Co., supra, 173 Iowa 144, 155 N. W. 343, is cited in
support of the above quotation, to the effect " 'that we have re-
laxed it somewhat when the question arises as to the cause of the
death of a human being. State v. Hessenius, 165 Iowa 415.' "
No mention is made of the fact that it was a criminal case. In
no other decision or authority have we found such a reason
advanced as. the basis for such an exception. This statement
from the Kirby case is inconsistent with its own decision, since
the plaintiff sued for damages for the death of her husband who
was the engineer of the locomotive which exploded and caused
his death. Notwithstanding "the death of a human being" was
involved, this court reversed a judgment for plaintiff because
an expert was permitted to give his opinion as to "what was
the cause or causes that produced the explosion"); State v.
Tippet, 94 Iowa 646, 63 N. W. 445 (a doctor was permitted
to give his opinion that a bullet "caused" the death); McGovern
v. Inter Urban Ry. Co., 136 Iowa 13, 111 N. W. 412, 13 L. R. A.,
N. S., 476, 125 Am. St. Rep. 215 (expert permitted to give his
opinion that "some such external violence" caused the injury);
State v. Korth, 204 Iowa 1360, 217 N. W. 236 (a medical witness,
answering a hypothetical question based on testimony of others
and his own examination of the body of deceased, was permitted
to state that in his opinion, death *was caused by morphine
poisoning.* The court held the objection that the question in-
vaded the province of the jury was "without merit"); State v.
Campbell, supra, 213 Iowa 677, 239 N. W. 715 (a ballistic expert
gave his "conclusion" that the same gun fired both bullets);
Searles v. Northwestern Mut. L. Ins. Co., 148 Iowa 65, 126 N. W.
801, 29 L. R. A., N. S., 405 (witnesses for plaintiff testified that
in their judgment the insured was incapable of transacting
business at and before the time he made the policy assignment.
Objection of invading province of jury was made, but court
held, in view of Glass v. Glass, 127 Iowa 646, 103 N. W. 1013, and
State v. McGruder, supra, 125 Iowa 741, 101 N. W. 646, the
answers were not open to the objection); Erwin v. Fillenwarth,
160 Iowa 210, 217, 137 N. W. 502, 505 (a layman testified that

his father ''was capable of looking after financial affairs.'' Respecting the contention that the opinion allowed the witness to pass on the merits of the case, the court referred to State v. McGruder, supra, Glass v. Glass, supra, Searles v. Northwestern Mut. L. Ins. Co., supra., In re Will of Overpeck, 144 Iowa 400, 120 N. W. 1044, and said: ''Nothing need be added to what has been said in these decisions'') ; Brownfield v. Chicago, R. I. & P. Ry. Co., 107 Iowa 254, 77 N. W. 1038 (witness testified that action of engine ''indicated'' a broken axle, notwithstanding it was the province of the jury to say whether that was the cause of the derailment) ; Brier v. Chicago, R. I. & P. Ry. Co., 183 Iowa 1212, 1226, 168 N. W. 339, 344 (answering a hypothetical question, expert gave opinion as to what caused the pain. The court, by Justice Gaynor, discussed the question fully, and, after stating that it was ''clearly'' proper, said: ''We are content to let this case rest on the rule laid down in State v. Hessenius'' [165 Iowa 415] ) ; Sterler v. Busch, 197 Iowa 231, 238, 195 N. W. 369, 372 (answering a hypothetical question, the doctor gave it as his opinion that the particular physical condition of the plaintiff was the cause of her ailment. To the objection that the question was not in proper form and that what ''might'' or ''probably'' caused the trouble should have been asked, the court, through Chief Justice Preston, said: ''We think that the objection is not well taken. There are many cases on this subject, but the citation of two or three will suffice. See State v. Hessenius, 165 Iowa 415, 429 ; Brier v. Chicago, R. I. & P. R. Co., 183 Iowa 1212, 1222, et seq.'') ; Ruff Drug Co. v. Western Iowa Co., 191 Iowa 1035, 1046, 181 N. W. 408, 413, 15 A. L. R. 962 (an action by a lessee for damages to stock of goods by negligence of lessor in repairing building. Trial court below was Judge Anderson, late of this court. An expert on building construction, answering a hypothetical question as to what would be the effect upon the center wall of doing the work in the manner assumed, said he would expect it to ''cause'' the wall to collapse. This court in affirming, speaking through Justice Stevens, said: ''The objection * * * was that it invaded the province of the jury, and asked the witness to pass upon the ultimate facts. The objection is not well taken.

\* \* \* We need not review the authorities cited, but the question comes reasonably within the rule of \* \* \* Brier v. Chicago, R. I. & P. R. Co., 183 Iowa 1212'') ; Bird v. Hart-Parr Co., supra, 165 Iowa 542, 146 N. W. 74 (a doctor was permitted, over objection that it called for an opinion and conclusion and was not a proper subject of expert testimony, to testify as to what caused the pain which plaintiff was suffering.) In Weber v. Chicago, R. I. & P. Ry. Co., 175 Iowa 358, 375, 151 N. W. 852, 859, L. R. A. 1918A, 626, an important question was whether the negligence of defendant or an intervening act caused a spreading of the rails. It was contended by the defendant that the spikes had been pulled. Lay opinion testimony was refused, that the impressions on the ties indicated the spikes had been pulled with a crowbar. It was a most important factor in the case. In holding that this was error, the court, through Gaynor, J., said: "This is a rule of necessity. The best evidence of which a case in its nature is susceptible must be produced and used. It is the only way in which the knowledge of the witnesses *as to the ultimate fact,* gathered from their inspection and knowledge of the fact, can be brought to the attention of the jury." (Italics ours.) Erickson v. Barber, 83 Iowa 367, 49 N. W. 838 (attending doctor was permitted to say injuries *were* permanent) ; Greenway v. Taylor County, 144 Iowa 332, 122 N. W. 943 (attending physician permitted to say plaintiff *has* suffered pain since injury) ; Scott v. Sovereign Camp of W. O. W., 149 Iowa 562, 129 N. W. 302.

In the cases cited above the opinions were given largely by experts. But in many classes of cases, we have permitted lay witnesses to express opinions on the only question before the jury. This is true in almost every case where a person is tried for intoxication, or for operating a motor vehicle while intoxicated. No one would ever think of objecting that the opinion invades or usurps the function of the jury and answers the ultimate and only question the jury has to decide. No fact basis need be given for such an opinion. Opinion testimony is permitted that seized liquor is intoxicating—the ultimate question in many liquor prosecutions. A nonexpert may, by his opinion testimony, convict one for violating a speed ordinance, in such case the only question, of course, being the rate of speed.

A witness, expert or nonexpert, may, by his opinion testimony that a person is insane or otherwise mentally defective, commit him to an asylum, place him under guardianship, break his will, or set aside his deed or other contract. In any such case a controlling issue is his mental condition, and yet such opinions are admissible. A jury may send a person to imprisonment on the opinion testimony of a handwriting expert, or a layman, that he forged a signature and yet the ultimate fact is, Did he forge the signature? On a great variety of matters opinions may be received which may carry great weight in determining the decision of a jury or other tribunal.

We have referred to authorities, and to decisions of other courts. Many more may be found in the texts and decisions cited. We will, therefore, cite but a few which fully support the decisions of this court last referred to. See Travelers Ins. Co. v. Drake, 9 Cir., Cal., 89 F. 2d 47, 49; United States Fid. & Guar. Co. v. McCarthy, 8 Cir., Iowa, 50 F. 2d 2 (expert witness permitted to give opinion on the ultimate issue, whether the doctor was able to do surgery); Svenson v. Mutual L. Ins. Co., 8 Cir., S. D., 87 F. 2d 441; New York L. Ins. Co. v. Doerksen, 10 Cir., Kan., 64 F. 2d 240, 241; Woelfle v. Connecticut Mut. L. Ins. Co., 8 Cir., Mo., 103 F. 2d 417, 419; Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; Illinois Power & Light Corp. v. Hurley, 8 Cir., Mo., 49 F. 2d 681, 685; New York Life Ins. Co. v. Wolf, 8 Cir., S. D., 85 F. 2d 162, 165; Western Coal & Min. Co. v. Berberich, 8 Cir., Ark., 94 F. 329; Central Coal & Coke Co. v. Williams, 8 Cir., Ark., 173 F. 337; Denver & R. G. R. Co. v. Roller, 9 Cir., Cal., 100 F. 738, 49 L. R. A. 77; Runkle v. United States, 10 Cir., Colo., 42 F. 2d 804; Chicago, B. & Q. R. Co. v. Conway, 8 Cir., Mo., 29 F. 2d 551; Watson v. Hardaway-Covington Cotton Co., 223 Ala. 443, 137 So. 33; Moore v. Norwood, 41 Cal. App. 2d 359, 106 P. 2d 939; Britton v. Hartshorn, 113 Conn. 484, 156 A. 48; Kelley v. Daily Co., 56 Mont. 63, 181 P. 326; O'Kelley v. Mutual L. Ins. Co., 197 S. C. 109, 14 S. E. 2d 582; Brotherhood of Locomotive Firemen v. Raney, Tex. Civ. App., 101 S. W. 2d 863; Marsh Wood Products Co. v. Babcock & Wilcox Co., 207 Wis. 209, 240 N. W. 392; Lemley v. Doak Gas Engine Co., 40 Cal. App. 146, 180 P. 671; Coulombe v. Horne

Coal Co., 275 Mass. 226, 175 N. E. 631; Van Steenbergen v. Barrett, 286 Mass. 400, 190 N. E. 597; State ex rel. State Highway Comm. v. Lindley, 232 Mo. App. 831, 113 S. W. 2d 132; Vann v. Atlantic Coast Line R. Co., 182 N. C. 567, 109 S. E. 556; Metropolitan L. Ins. Co. v. Saul, 189 Ga. 1, 5 S. E. 2d 214; Plano Foundry Co. v. Industrial Comm., 356 Ill. 186, 190 N. E. 255, 260, 261; Wild v. Pitcairn, 347 Mo. 915, 149 S. W. 2d 800; Texas & Pac. Ry. Co. v. Watson, 190 U. S. 287, 23 S. Ct. 681, 47 L. Ed. 1057; Ekblom v. Reed, 5 Cir., Fla., 71 F. 2d 399; Cooper v. Metropolitan L. Ins. Co., 323 Pa. 295, 186 A. 125, 111 A. L. R. 598, 603 (see annotation); Clay County Cotton Co. v. Home Life Ins. Co., 8 Cir., Ark., 113 F. 2d 856; Armour & Co. v. Leasure, 177 Md. 393, 9 A. 2d 572, 578.

The American Law Institute, at the May 1942 meeting, adopted a proposed final draft of a Code of Evidence. Rule 401, page 199, thereof—Testimony in Terms of Opinion—provides:

"(1) In testifying to what he has perceived a witness, whether or not an expert, may give his testimony in terms which include inferences and may state all relevant inferences, whether or not embracing ultimate issues to be decided by the trier of fact, unless the judge finds:" (a) (in substance) that the witness is not qualified; or (b) the witness can readily state facts from which the triers can deduce the inferences.

In the notes and comment about this rule, in the Code, we find:

"The entire body of the law dealing with opinion evidence of both lay and expert witnesses needs revision. The rules evolved in this country prohibiting a witness from stating in terms of inference relevant matters which he has perceived have been the sources of numerous trivial appeals and many undeserved reversals. They are uncertain in phrasing and capable of capricious application. There has appeared in the more recent decisions a tendency to disregard them or at least to refuse to interfere with their application by the trial courts. * * * The American decisions concerning opinion evidence exhibit much confusion in statement and inconsistency in application. * * * Where a witness is attempting to communicate the

impressions made upon his senses by what he has perceived, any attempt to distinguish between so-called fact and opinion is likely to result in profitless quibbling. Analytically no such distinction is possible. The English common law does not attempt to prevent a witness from describing his experiences in terms including inferences.'' Code of Evidence, pages 198–201.

In view of the numerous decisions of this court and of other courts, and of the pronouncements of eminent authorities, we think there can no longer be any question of the soundness of the rule that if the matter before the tribunal for determination is one in which opinion testimony, either lay or expert, is necessary or proper, the witness may express his opinion either as to the possibility, probability, or actuality of the matter of fact about which he is interrogated, and the answer will not be an invasion or usurpation of the province or function of the jury, even though it passes upon an ultimate fact which the jury must determine.

Of course, we are not to be understood as saying that opinion testimony should be received as to all matters. It should be received only as to such matters as are the proper subjects of opinion testimony. No witness should be permitted to give his opinion directly that a person is guilty or innocent, or is criminally responsible or irresponsible, or that a person was negligent or not negligent, or that he had capacity to execute a will, or deed, or like instrument, or, as held by us in Halligan v. Lone Tree Farmers Exchange, 230 Iowa 1277, 1283, 300 N. W. 551, respecting whether a county attorney had probable cause to believe the plaintiff was guilty of the crime charged. But the reason is that such matters are not subjects of opinion testimony. They are mixed questions of law and fact. When a standard, or a measure, or a capacity has been fixed by law, no witness, whether expert or nonexpert, nor however qualified, is permitted to express an opinion as to whether or not the person or the conduct in question measures up to that standard. On that question the court must instruct the jury as to the law, and the jury must draw its own conclusion from the evidence. However, courts have permitted both scientific and practical experts to express their opinion whether a certain method used, or course of conduct, was a proper one.

362

It is, therefore, our judgment that pronouncements of this court contrary to our decision on the law as herein stated, and as held in Justis v. Union Mut. Cas. Co., State v. Steffen, Martin v. Des Moines Edison L. Co., Kirby v. Chicago, R. I. & P. Ry. Co., Sever v. Minneapolis & St. L. Ry. Co., and Sachra v. Town of Manilla, all referred to herein, and like holdings in other cases, are hereby overruled.

Appellant also assigned error in the admission of expert-opinion testimony of two veterinary doctors used by the appellee. Appellant complains that the record does not show that either of them knew just how or what the turkeys had been fed, and that the jury were not informed as to the facts which these experts took into consideration in forming their opinions. The record discloses that the jury had been told fully by other witnesses just what was fed to the turkeys, and how they were fed, and that the appellee had informed the witnesses of these facts. It is our judgment that the objection to the questions did not raise these points. Neither do we think that the rule stated in Switzer v. Baker, 178 Iowa 1063, 160 N. W. 372, has any application under the facts. We find no error in these matters.

The judgment appealed from is affirmed.—Affirmed.

STIGER, GARFIELD, HALE, and OLIVER, JJ., concur.

SAGER and MITCHELL, JJ., concur in result.